ORIGINAL

1  Charles F. Kester (SBN 157763)
   DELANEY KESTER LLP
2  4505 Las Virgenes Road, Suite 203
   Calabasas, California 91302
3  (818) 974-8627 • (818) 914-6911 (fax)
4  *charles@delaneykester.com*

5  Royston H. Delaney (*Of Counsel*)
   Ilyas J. Rona (*Of Counsel*)
6  DELENEY KESTER LLP
7  Seven Liberty Square, 2nd Floor
   Boston Massachusetts 02109
8  (857) 498-0384
9  *royston@delaneykester.com*
   *ilyas@delaneykester.com*
10
   Attorneys for Plaintiff-Relator Max Bennett
11

**FILED**

OCT 14 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

SEALED

12          UNITED STATES DISTRICT COURT

13          EASTERN DISTRICT OF CALIFORNIA

14  THE UNITED STATES OF AMERICA;          CASE NO. **2:14 - CV - 2 4 0 7 TLN CKD**
15  THE STATES OF CALIFORNIA,
    COLORADO, CONNECTICUT,
16  DELAWARE, FLORIDA, GEORGIA,
17  HAWAII, ILLINOIS, INDIANA, IOWA,       **COMPLAINT**
    LOUISIANA, MARYLAND, MICHIGAN,
18  MINNESOTA, MONTANA, NEVADA,            PLAINTIFF-RELATOR DEMANDS
    NEW JERSEY, NEW MEXICO, NEW YORK,      TRIAL BY JURY ON ALL COUNTS
19  NORTH CAROLINA, OKLAHOMA,
20  RHODE ISLAND, TENNESSEE, TEXAS,
    WASHINGTON, and WISCONSIN; THE         *FILED IN CAMERA and UNDER SEAL*
21  COMMONWEALTHS OF                        *pursuant to the Federal False Claims Act,*
22  MASSACHUSETTS and VIRGINIA; and        *31 U.S.C. § 3730(b)(2), and pursuant to the*
    THE DISTRICT OF COLUMBIA,              *analog false claims acts of the Plaintiff*
23                                         *States and the District of Columbia*
    *ex rel.* MAX BENNETT,
24
               Plaintiffs,
25
          v.
26
    BIOTRONIK, INC.,
27
               Defendant.
28

## INTRODUCTION

1.     Plaintiff–Relator Max Bennett ("Relator") brings this action on behalf of the United States of America, 28 States ("the Plaintiff States")[1], and the District of Columbia ("the District") to recover monies wrongfully paid by those entities as a result of false and/or fraudulent claims caused by Defendant Biotronik, Inc. ("Biotronik" or "Defendant").  Relator brings this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and pursuant to the *qui tam* provisions of the analog false claims acts of the Plaintiff States and the District (*see* Counts II-XXX, *infra*). Pursuant to 31 U.S.C. § 3730(b)(2) and comparable state-law provisions, this action is brought *in camera* and under seal.

2.     Defendant Biotronik is principally engaged in the manufacture and sale of implantable cardiovascular medical devices, such as pacemakers and implantable cardioverter defibrillators ("ICDs").

3.     During his half-decade employment at Biotronik from 2004-2010, Relator learned that the company was knowingly and deliberately engaging in unlawful conduct to market its implantable medical devices that violated both federal and state "anti-kickback" laws.  This unlawful conduct consisted, *inter alia*, of funneling tens of millions of dollars in kickbacks to physicians under the pretext of Biotronik-sponsored scientific studies so as to influence their decisions to use Biotronik's products, and so as to generate increased sales

---

[1]  The 28 "Plaintiff States" on whose behalf Relator brings this action are:  California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin.

of Biotronik's products. Indeed, these kickbacks induced many doctors to use Biotronik's products for the first time, thereby generating sales and increasing market share that Biotronik otherwise would not have had. Specifically, these kickbacks provided powerful financial incentives for doctors to use Biotronik's products that were more effective than mere price competition. For example, if Biotronik simply had discounted its products by the same dollar amount as the kickbacks, the effect on sales would have been much less, because the cost of Biotronik's products is, from the doctor's perspective, a pass-through cost to the patient (or to the public or private insurer) that does not financially benefit the doctor – and thus, absent the kickbacks, doctors would not be financially incentivized to implant discounted Biotronik products.

4.      As a result of Biotronik's unlawful conduct, *thousands of false and/or fraudulent claims totaling tens (if not hundreds) of millions of dollars* were submitted to (and paid by) the United States, the Plaintiff States, and the District for Biotronik medical devices and/or the related medical procedures that used them. That is because Biotronik's unlawful conduct – *i.e.*, violating the "anti-kickback" laws – conclusively tainted those government reimbursement claims and made them ineligible for payment under both federal and state law.

5.      Accordingly, Biotronik is liable for knowingly causing these false and/or fraudulent claims to be presented to the United States for payment in violation of 31 U.S.C. § 3729, *et seq.* Biotronik is similarly liable for causing false and/or fraudulent claims to be presented for payment to the Plaintiff States and the District under their respective false claims acts.

- 3 -

**THE PARTIES**

6.    Relator Max Bennett ("Relator") is a United States citizen who resides near Orlando, Florida.  He was employed by Defendant Biotronik for five-and-a-half years from December 2004 to April 2010.  During his employment, Relator held several positions. First, he was a Product Manager in Portland, Oregon (Dec. 2004 – Jan. 2006); then, he was a Business Development Manager/Specialist in Denver, Colorado (Jan. 2006 – May 2008), with responsibilities that included Biotronik's scientific studies and marketing efforts in the Western United States (covering 28 states); he was the District Sales Manager for the lucrative Las Vegas, Nevada market (May 2008 – Jan. 2010); and, lastly, he served as Regional Sales Director for the Western Region (Jan.-April 2010) until he was terminated. For a number of years prior to and subsequent to his Biotronik employment, Relator also worked for other companies in the areas of medical device and biotechnology sales and development.  He earned a Master of Business Administration degree, *Cum Laude*, from Michigan State University in 2002; and a Bachelor of Science degree in Nursing, *Cum Laude*, from Oakland University (Rochester, MI) in 1998.  In addition, Relator is a registered nurse ("RN") with active licenses in Florida and Michigan, and with inactive licenses in California, Colorado, and Nevada.

7.    Defendant Biotronik, Inc. ("Biotronik" or "Defendant") is, upon information and belief, a privately-held Oregon corporation with its principal place of business in Lake Oswego, Oregon.  Biotronik is the United States arm of a global company called Biotronik SE & Co. KG ("Biotronik Worldwide"), which is based in Germany and which is principally engaged in the manufacture and sale of implantable cardiovascular medical devices (*e.g.*, pacemakers and ICDs).  Upon information and belief, Biotronik (*i.e.*, the U.S. company) had

approximately $250 million in total U.S. revenues in 2009; and in the years preceding and following, Biotronik's U.S. revenues were similarly large or larger.  Biotronik conducts business on a national scale, marketing its products to hospitals and physicians throughout the United States.

## JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*  In addition, the FCA specifically confers jurisdiction upon this Court pursuant to 31 U.S.C. § 3732(b).

9.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the Plaintiff States and the District on the grounds that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.    This Court has personal jurisdiction over Biotronik pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Biotronik has sufficient minimum contacts with the United States of America.

11.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because Biotronik is based in and transacts business in this judicial district.

12.    In the event that there has been any public disclosure of the actionable information or allegations that are contained in this Complaint, Relator is an "original source" as defined by law with respect to any such disclosed information or allegations.  Prior to filing this action, Relator voluntarily provided information to the United States,

the Plaintiff States, and the District regarding the false/fraudulent claims that are the subject of this Complaint. Relator did so on or about August 29, 2014.

13.     On March 31, 2010, Relator filed a false claims action against Biotronik in the United States District Court for the District of Nevada – *United States, et al., ex rel. Bennett v. Biotronik, Inc., et al.*  That case subsequently was transferred to this district and assigned Case No. CIV S-10-CV-1273 KJM-EFB (E.D. Cal.).  Relator voluntarily dismissed his case and the Court entered an order of dismissal *without prejudice* on May 29, 2014.  The Court issued an order denying Biotronik's motion to seal the court file in that case on August 19, 2014 – but in doing so, the Court ordered that a few redactions be made to Relator's Third Amended Complaint.  Consistent with the Court's direction, a redacted Third Amended Complaint was submitted to the Court for filing; but as of October 11, 2014, the Court has not filed that document, and Relator's previous action against Biotronik is still shown as being "Sealed" on the Court's PACER records system.

## FEDERAL AND STATE FALSE CLAIMS ACTS

14.     The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

15.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the

- 6 -

amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

16.     The FCA, 31 U.S.C. § 3729(a)(1)(C)), makes any person, who conspires to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

17.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  31 U.S.C. § 3729(b)(2).

18.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

19.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

## GOVERNMENT HEALTH INSURANCE PROGRAMS

20.     The Health Insurance for the Aged and Disabled Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.* (popularly known as "Medicare"), is a health

insurance program administered by the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services ("HHS") through its Centers for Medicare and Medicaid Services ("CMS").

21. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment for persons over sixty-five (65) years of age; and for certain others that qualify under the terms and conditions of the program, including many individuals who are permanently disabled under the Social Security Act.

22. Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the private insurance carriers act on behalf of CMS.

23. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v (hereafter "Medicaid"), is a health insurance program administered by the United States and the various individual states that is funded by both federal and state taxpayer revenue. The United States uses CMS to oversee Medicaid.

24. Medicaid was designed to assist participating states in providing hospital services, medical services, durable medical equipment, and prescription drugs to, among others, financially-needy individuals that qualify for Medicaid. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. *See* 42 C.F.R. §§ 430.0–430.30 (1994).

25. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS" – now known as "TRICARE"), 10 U.S.C. §§ 1071–1106, provides benefits for

- 8 -

health care services furnished by civilian providers, physicians, and suppliers to members of the uniformed services and to spouses and children of active duty, retired, and deceased members. The program is administered by the Department of Defense and funded by the federal government.

26. The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase medical devices for patients treated at such facilities and otherwise.

27. The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, medical devices for its beneficiaries. (Together, all of the programs described above in paragraphs 21–28, and any other government funded health care programs, shall be referred to as "Government Health Care Programs.")

28. Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid, and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

29. Each of the Government Health Care Programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute (discussed below) and with other federal laws governing the

- 9 -

provision of health care services in the United States.  That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

30.    In other words, if a provider were to tell CMS or its agent that it had provided goods or services that were in violation of the Anti-Kickback Statute, that were not medically unnecessary, that were performed solely for the profit of the provider, and/or that violated another relevant law, then CMS would not pay the claim.

## FEDERAL AND STATE ANTI-KICKBACK LAWS

31.    The Medicare and Medicaid Patient Protection Act, also known as "the Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population.  To protect the integrity of Government Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form.  The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs."  H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

32.    In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail.  *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b.

- 10 -

In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that "cheat[ ] taxpayers who must ultimately bear the financial burden of misuse of funds . . . [that] divert[ ] from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and that] erode[ ] the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." H.R. Rep. No. 95–393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.[2]

33. In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

34. The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good, service, or item for which payment may be made in whole or in part by a Government Health Care Program (*e.g.*, Medicare), which also includes any state health program funded in part by the federal government (*e.g.*, Medicaid). 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

35. The Anti-Kickback Statute provides, in pertinent part:

---

[2] Congress sought to "give a clear, loud signal to the thieves and the crooks and the abusers that we [Congress] mean to call a halt to their exploitation of the public and the public purse." 123 Cong. Rec. S31767 (daily ed. Sept 30, 1997) (Sen. Talmadge statement).

(b) Illegal remunerations

\* \* \*

     (2)   Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

         (A)  To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or

         (B)  To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

36.    Concern about unlawful marketing practices in violation of the Anti-Kickback Statute prompted the Office of the Inspector General of the Department of Health and Human Services ("HHS-OIG") to issue compliance guidance. The HHS-OIG has advised that medical device companies should be guided by the compliance guidance that it published in 2003 for the pharmaceutical industry. *See* "Examining the Relationship Between the Medical Device Industry and Physicians," Testimony of Gregory Demske, Assistant IG for Legal Affairs, HHS-OIG, before the Senate Special Comm. on Aging (Feb. 27, 2008). The HHS-OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003) ("HHS-OIG Guidance") identifies a number of suspect marketing practices.

- 12 -

37.     Among the suspect practices the HHS-OIG identified were company payments to physicians who had offered no particular services of benefit to the company but who had generated in the past, or had the potential to generate in the future, a large volume of business for the company.  The HHS-OIG Guidance cautions, *inter alia*, against the following suspect practices:

   **a.** **Improper consulting and advisory payments.**  These are payments made pursuant to less than bona fide consulting or advisory arrangements, such as payments to physicians for simply attending meetings or conferences in a passive capacity, or for services connected with a manufacturer's marketing activities, and payment for more than fair market value.

   **b.** **Improper business courtesies and other gratuities**:  Gifts such as merchandise of more than trivial value, entertainment, recreation, travel, meals, and other gratuities furnished in association with information or marketing presentations.

   **c.** **Improper educational funding**:  Funding for educational programs that is driven by marketing purposes rather than bona fide educational purposes.

38.     Moreover, a transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is not its exclusive intent.  The HHS-OIG expressly has stated that it is enough that "***any one purpose*** of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program."  HHS-OIG Guidance, *supra*, 68 Fed. Reg. 23731 (emphasis added).  The HHS-OIG Guidance further clarifies that even "a lawful purpose will not legitimize a payment that also has an unlawful purpose."  *Id.*  Thus, for example, "under the anti-kickback statute, neither a legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (*i.e.*, the purposeful inducement of business)."  *Id.*

39.     In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in Government Health Care Programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

40.     The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment, gift, or other remuneration by a company to a physician or other person which has as one of its purposes the inducement of the physician to use the company's products or the inducement of the physician to influence or recommend the use of the product.

41.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under all Government Health Care Programs, including Medicare and state Medicaid programs.  Moreover, compliance with the Anti-Kickback Statute is a *condition of payment* for any claims for which Medicare or Medicaid reimbursement is sought.  Either pursuant to provider agreements, claims forms, hospital costs reports, or other appropriate manner, physicians and hospitals who participate in Government Health Care Programs must certify that they have complied with all applicable federal rules and regulations, including the Anti-Kickback Statute.  For example, every provider who enters into a contract with Medicare specifically acknowledges in its provider contract that the provider understands "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in

Medicare." Upon information and belief, each of the Plaintiff States' and the District's provider agreements in their respective Medicaid programs contains comparable provisions requiring providers to agree to comply with the Anti-Kickback Statute and acknowledging that their receipt of payment is conditioned upon compliance with such provisions.

42.     Medicare and Medicaid claims for reimbursement of any goods or services that were the subject of a kickback constitute false claims (see False Claims Act discussion, *supra*). This is because compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under all Government Health Care Programs, including Medicare and state Medicaid programs. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any goods or services reimbursed by Medicare or Medicaid, including medical devices and related medical procedures using those devices.

43.     Furthermore, the Anti-Kickback Statute was amended, effective March 23, 2010, to expressly provide that: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Consequently, any kickbacks paid by Biotronik on or after March 23, 2010, that caused reimbursement claims to be presented to the government for payment would result in actionable false claims regardless of the provisions of any provider agreement.

44.     When a kickback has been paid, the measure of damages is the full amount of the claim caused by the kickback—such as the amounts billed to Medicare or Medicaid for a kickback-tainted Biotronik medical device and the related medical procedure using that device. All such kickback-tainted payments are owed back to the government.

45.    From at least 2004 (if not earlier) through the present, the United States (through Medicare, Medicaid, and other Government Health Care Programs), and the Plaintiff States and the District (through Medicaid), have paid *tens (if not hundreds) of millions of dollars in false and/or fraudulent claims* for Biotronik medical devices and related medical procedures that were tainted by Biotronik's knowingly having paid <u>tens of millions of dollars in kickbacks</u> to physicians – *i.e.*, via Biotronik-sponsored scientific studies that were expressly used as a marketing tool to financially reward physicians who used Biotronik's products.

46.    Indeed, in recent years, allegations that some of Biotronik's competitors used scientific studies to unlawfully promote sales of their pacemakers and ICDs have resulted in large FCA settlements against those companies. For example, in December 2011, Medtronic Inc. agreed to pay *$23.5 million* to settle such claims. *See* DOJ Press Release, "Minnesota-Based Medtronic Inc. Pays US $23.5 Million to Settle Claims That Company Paid Kickbacks to Physicians" (Dec. 12, 2011) (available online at *http://www.justice.gov/opa/pr/2011/December/11-civ-1623.html*). And, earlier that same year in January 2011, St. Jude Medical Inc. agreed to pay *$16 million* to settle similar claims. *See* DOJ Press Release, "Minnesota-Based St. Jude Medical Pays U.S. $16 Million to Settle Claims That Company Paid Kickbacks to Physicians" (Jan. 20, 2011) (available online at *http://www.justice.gov/opa/pr/2011/January/11-civ-078.html*).

## FACTUAL ALLEGATIONS

I.    **Biotronik's Cardiac Pacemakers and ICDs**

47.    Cardiac pacemakers are self-contained, battery-operated units that send electrical stimulation to the heart. They are generally implanted to alleviate symptoms of

- 16 -

1   decreased cardiac output related to abnormal heart beat and/or rhythm. Pacemakers are

2   covered under Government Health Care Programs (including Medicare and Medicaid) as

3   prosthetic devices. Such coverage also extends to a variety of services for the post-implant

4   follow up and evaluation of implanted cardiac pacemakers. Biotronik's pacemakers sell

5

6   to hospitals for approximately $5,000-$6,000 per unit – but the hospitals typically bill

7   Government Health Care Programs for the devices at twice or more their cost.

8       48.    Implantable cardioverter defibrillators ("ICDs") are electronic devices

9   designed to detect and treat life-threatening arrhythmias. An ICD consists of a pulse

10  generator and electrodes for sensing and defibrillating. ICDs also are covered as prosthetic

11
    devices under Government Health Care Programs (including Medicare and Medicaid).
12
13  Biotronik's ICDs sell to hospitals for approximately $20,000-$25,000 per unit – but again,

14  the hospitals typically bill Government Health Care Programs for the devices at twice or

15  more their cost.

16
        49.    Pacemakers and ICDs are typically prescribed by physicians and purchased
17
18  by hospitals. Often, a cardiologist will refer a patient to an electrophysiologist ("EP"), who

19  is a doctor that specializes in implantable cardiac devices. Either the cardiologist or the EP

20  may recommend a particular device for the patient. The physician instructs the hospital on

21
    what brand and model of device he or she wants, and the hospital buys the device. Because
22
23  the industry considers implantable cardiac devices to be "physician preference" items,

24  cardiologists and EPs are the target audience for sales teams of medical device companies

25  that sell pacemakers and ICDs.

26
        50.    Pacemakers and ICDs are usually implanted in an inpatient procedure;
27
28  whereas, replacement devices sometimes are done on an outpatient basis. Ordinarily, each

- 17 -

device must be monitored every three to six months. Hospitals purchasing pacemakers and ICDs are reimbursed by Medicare (and other Government Health Care Programs) through the use of "Diagnostic Related Group" ("DRG") reimbursement codes, which pay a fixed reimbursement amount to the hospital for the entire procedure. Physicians are reimbursed separately for their professional services using "Current Procedural Terminology" ("CPT") codes, which are assigned to the different aspects of the physician services, including monitoring the device.

51.     In 2009, DRG Codes for pacemakers were 242-244, 258-262 and payment ranged from $5,500 to $20,000; and DRG Codes for ICDs were 222-227, 245 and 265 and payment ranged from $12,000 to $48,000. Those reimbursement ranges typically have increased 2-5% annually.

52.     Biotronik has a sales force that is divided nationally by region. As of 2010 (Relator's last year at the company), Tom Brown was the Executive Vice President of Sales, and he oversaw three Vice Presidents of Sales: one for the Eastern United States, Hugh McCullough; one for the Western United States, Bob Musmanno (who was replaced sometime in 2010); and one for the Central United States, Douglas McKinney. Each Vice President of Sales oversaw several regional sales directors. Mr. Brown reported to Jake Langer, the President of Biotronik.

## II.    Biotronik's Use of Scientific Studies to Pay Kickbacks to Physicians

### A.    Scientific Studies Can Be Kickbacks

53.     The FDA often requires medical device companies to conduct post-marketing, scientific studies concerning their products (sometimes called "clinical studies"). And other

- 18 -

times, medical device companies decide on their own to conduct such studies, without any directive from the FDA.

54.    In May 2003, the HHS-OIG issued its "Compliance Program Guidance for Pharmaceutical Manufacturers," 68 Fed. Reg. 23731 (the "HHS-OIG Guidance"); and, the HHS-OIG has advised that medical device companies should be guided by the same HHS-OIG Guidance. (*See, supra*, ¶¶ 37-39.) The HHS-OIG Guidance warns companies not to use scientific studies as a "pretext to generate" sales. Specifically, the HHS-OIG Guidance states:

> Post-marketing research activities should be especially scrutinized to ensure that they are legitimate and *not simply a pretext to generate prescriptions of a drug*. Prudent manufacturers will develop contracting procedures that clearly separate the awarding of research contracts from marketing. *Research contracts that originate through the sales or marketing functions – or that are offered to purchasers in connection with sales contacts – are particularly suspect.*

HHS-OIG Guidance, 68 Fed. Reg. at 23735-36 (emphasis added).

55.    In the case of Biotronik – and regardless of whether the scientific studies were mandated by the FDA or done voluntarily – the company expressly and repeatedly used those studies as an unlawful marketing tool to boost their sales of pacemakers and ICDs. In particular, Biotronik used the studies to funnel huge sums of money into the pockets of favored physicians – who were favored because of their past use and/or expected future use of Biotronik's products.

56.    For example, for its CELESTIAL and GALAXY studies – each of which enrolled up to 2,000 patients – Biotronik paid doctors *$750 per patient* enrollment and an additional $200 for patient follow-up visits every 3 to 6 months, with a maximum payment

- 19 -

to the doctor of *$4,550 per patient*. For the physician, that is additional income on top of – and often dwarfing – what he or she legitimately receives for doing the medical procedures themselves. Thus, a cardiologist who enrolled 100 of his patients in either of those studies would be paid at least $75,000, and perhaps as much as $455,000. Such payments for scientific studies – which totaled tens of millions of dollars – were unlawful kickbacks because Biotronik expressly intended its scientific studies to drive product sales.

B. **Biotronik Unlawfully Uses Scientific Studies to Drive Product Sales**

1. **Scientific Studies = Biotronik Marketing Strategy**

57. Biotronik's prevalent use of scientific studies is driven by commercial greed and the needs of its sales force, rather than by clinical or research purposes. Biotronik sales representatives are directed to target physicians and to persuade them to enroll patients in the studies in order to sell Biotronik devices (pacemakers and ICDs). The company also distributes to its sales force monthly reports explaining the enrollments in scientific studies by sales region and encouraging the use (more accurately, "abuse") of these studies as "sales tools" to "drive sales" of Biotronik's devices.

58. At Biotronik sales meetings, it is acknowledged that some physicians will not use Biotronik devices unless they can enroll their patients in these scientific studies, and Biotronik refers to this category of physicians as "Pay to Play." For example, in October 2007, Biotronik's Sales Director for the Western Region, Rich Rimmer (who was Relator's boss), circulated a memorandum in which he set forth his "Action Plan" for winning Biotronik lucrative business at the Sharp Grossmont Hospital in San Diego. After noting that an EP, Dr. Peter Belott, was responsible for doing "about 70% of the [implantable

cardiac] devices at Grossmont," Mr. Rimmer explained: "The problem is the all powerful Dr. Peter Belott has totally shunned us." He then set forth his sales strategy as follows:

> The key to winning a significant portion of the Grossmont [Hospital] business will be converting a part of Dr. Belott's business. . . . Dr. Belott . . . may require *some concessions from Biotronik such as studies* or even the hiring of his son Brett.

Memo. from Rich Rimmer to Bob Musmanno entitled "Sharp Grossmont [Hospital] Analysis and Action Plan" (Oct. 10, 2007) (emphasis added). Not only was this memo directed to Mr. Musmanno, the Vice President of Sales for the Western United States, but the memo also was copied to Jake Langer, the President of Biotronik, Tom Brown, the Executive Vice President of Sales, and Relator, among others. None of those people ever told Relator that Mr. Rimmer had done anything wrong in advocating the use of scientific studies as "concessions" to win Biotronik device sales. As events unfolded, Dr. Belott did enroll patients in Biotronik studies, and he did convert some of his business to Biotronik devices; his wife (as opposed to his son) was hired by Biotronik.

59.     To the contrary, Biotronik – through its senior management – actively promoted the use of scientific studies to generate sales. Relatedly, Biotronik despised physicians who would sign on to do studies, but then not enroll significant numbers of patients. Those doctors were demeaned as being "losers." That insult was hurled by Biotronik's Executive Vice President of Sales, Tom Brown, in a December 11, 2008 email that he sent to the company's "Sales Management and Market Development Representatives." His email discussed the IMPACT study, and he attached a so-called "Loser List" that identified doctors and/or centers that had not implanted enough Biotronik devices to satisfy the company's sales goals. In particular, he scolded: "Please review the attached

[loser] list and think about why you elected to nominate the physicians or why we have 'failed' to implant any significant number of devices in the IMPACT clinical study." He then decreed that in general, the names on the "Loser List" should be "removed and replaced"; and he warned:

> Gentlemen, if you cannot get a minimum of two devices out of a center per month you are wasting our time! . . . Team again, two per month should be an absolute minimum, if they can't do that "move on down the road," and don't waste our time!

Email from Tom Brown to Sales Management and Market Development Representatives entitled "IMPACT CLINICAL STUDY ANALYSIS (The Loser List)" (Dec. 11, 2008). The recipients of his email included most, if not all, of Biotronik's Regional Sales Managers and Vice Presidents of Sales; Relator; and Kevin Mitchell, the Director of Clinical Studies. In a "reply all" email that same day by Mr. Mitchell, he advised: "If they [sites] do not perform for IMPACT, do not nominate them for a future study, they won't be accepted." Relatedly, for many years, Biotronik would penalize its sales reps $1,500 for each site they selected for a scientific study that failed to enroll enough patients in the study.

60.     Indeed, given their importance to Biotronik's bottom line, the company worked very hard to contrive new scientific studies, but not always with success. In doing so, the company routinely involved its marketing department. For example, on October 1, 2009, Kevin Mitchell sent Bob Musmanno an email expressing his frustration regarding a would-be study to be called EVIA, which was intended to fill an impending void that would be caused by the ending of the CLEAR study:

> *We are totally struggling with an idea for Evia.* As I mentioned before, we have had a *series of internal meetings with MKT* [marketing dept.] to come up with an idea. We went to the Expert panel for ideas. No one is interested in anything Brady

- 22 -

> [pacemaker] related except for VVS which will NOT fly as a
> launch study. Therefore, it is hard to come up with an idea
> that will appeal to the EP targets with Brady.

Email from Kevin Mitchell to Bob Musmanno (Oct. 1, 2009) (emphases added). Indeed, of the 16 scientific studies identified in this Complaint (*see*, *infra*, ¶¶ 82-141), *only two* were requested by the FDA; the *other 14* were "voluntary" studies contrived by Biotronik solely for the purpose of distributing kickbacks to doctors. Moreover, *all 16 studies* were implemented and funded by Biotronik as "sales tools" to "drive sales" of its cardiac devices (pacemakers and ICDs).

61.    It is no accident that Biotronik repeatedly has used scientific studies to increase sales of its products. Biotronik's unlawful practice in this regard is firmly rooted in the company's culture, dating back at least ten years to 2004, when Relator first became employed by the company. Documentary evidence of Biotronik's unlawful use of scientific studies abounds.

### 2.    Biotronik's 2005 Sales Plans

62.    In late-2004 or early-2005, Biotronik assembled a 90-page internal document entitled, "U.S. Marketing & Sales Plans 2005" ("the 2005 Sales Plans"), which was distributed to senior management within the company, and which contained marketing and sales strategies for each region of the United States. Throughout the 2005 Sales Plans, Biotronik discusses its past successes using scientific studies to increase product sales; and, Biotronik – through its senior management – repeatedly advocates using scientific studies to drive future sales.

63.    For example, in the section entitled, "Eastern US Business Plan," Biotronik explains in the "2004 Year in Review" subsection that "Scientific studies were better utilized

in '04' vs. '03'." And, in the "2005 Business Plan" subsection, the company states that "Scientific Studies will need management focus *to drive productivity*" (emphasis added). Under "Objectives," the company references a scientific study called AVAIL and states the objective to "Develop AVAIL site relationships and *drive productivity*" (emphasis added).

64.     In the Mid-Atlantic "Area Business Plan," the Area Director, Larry Carlson, notes in the "2004 Year in Review" that Biotronik sales for the area "most likely will exceed" the FY 2004 Total Revenue Plan. Mr. Carlson explains: "Success in large part was based on recruitment, *utilizing scientific studies*, . . . ." (emphasis added). In the "2005 Business Plan," Mr. Carlson lists various objectives, including "A 'whatever it takes' effort to make the AVAIL trial a success." Mr. Carlson also lists various "*sales tools* to be used for each defined target" (emphasis added) – and the first "sales tool" he identifies is "Scientific Studies."

65.     In the "Mid-West Region Sales Plan," the Sales Manager, Bob Burd, identifies various "Strategies" for 2005, including: "Strategy 3 – *Help drive Brady* [pacemaker] *sales by maximizing the AVAIL clinical*." (Emphasis added.) He then elaborates: "Tactic 3B – Each sales rep and or FCS responsible for an AVAIL clinical site will target that site by visiting with the clinical coordinator and PI [principal investigator] on a weekly basis *to help insure the maximum implants possible*." (Emphasis added.) He also describes: "Tactic 4B – *Utilize MVP, XATP, and SAFE* [scientific studies] *to help drive ICD sales* in those centers participating in these scientific studies." (Emphasis added.) And, he identifies: "Strategy 5 – *Maximize Protos CLS* [pacemaker] *sales by utilizing Scientific Studies*." (Emphasis added.)

- 24 -

66.    In the Northeast Region "Area Business Plan," the Area Director, John Panarello, complains that New England is "resistent [*sic*] to scientific studies." Likewise, his list of "Negative Impacts" includes "Hostile to After Market Studies." Nevertheless, in the "2005 Business Plan," he advises his sales reps to "Identify *Sales Tools*" (emphasis added) – and the first one listed is "Scientific Studies:  Need More Participation."

67.    In the Southeast Region "Area Business Plan," the Area Director, L.K. Rissanen also identifies "Scientific Studies" as being the first "Sales Tool" option on his list of sales tools to be used in 2005.  He also states that in 2004, one "Positive Impact" was that the "Option study [had] provided additional revenue to [Luke] Cousins and [Kenyon] Wells," who were two large independent sales representatives.

68.    In the Southeast Central "Area Business Plan," the Area Director, H. Ford McArver III, reviews 2004 and notes:  "In the area of clinical studies we had a very successful OPTION year with 3 sites a [*sic*] implanting in the top 10 on the centers."  And, like many of the other area directors, he too expressly identifies "Clinical Studies" as being one of the "sales tools" to be used in 2005.

69.    In the "South Western Area Sales Plan," the Sales Manager, Geoff Schaney, provides familiar language on the subject of scientific studies:  "Drive Brady [pacemaker] sales by maximizing implants of the AVAIL clinical.";  "Tactic 3B.  Each sales rep and/or FCS responsible for an AVAIL clinical site will target that site by visiting with the Clinical Coordinator and PI on a weekly basis to maximize site implant output.";  and "Tactic 4B. Drive [ICD] sales utilizing MVP, XATP and SAFE Scientific Studies by targeting those centers and reps responsible for the centers to minimally implant 1-2 devices per month."

70.     In the "Western Region Sales Plan," the Sales Manager, Rich Rimmer, identifies similar sales strategies for 2005: "Drive Bradycardia sales by maximizing implants of the AVAIL clinical."; "Drive [Tachycardia ICD] sales through Scientific Studies MVP, XATP and SAFE.  Ensure minimum compliance of 2-3 devices per month."; and "Maximize Protos CLS [pacemaker] sales through Scientific Studies."  In addition, he adds this tactic: "Tactic 1C:  Utilize Scientific Studies to facilitate quick transfer of business with new recruits.  Position Scientific Studies as a means for new physicians to critically evaluate performance of Biotronik products and that this evaluation is *fully funded by Biotronik*."  (Emphasis added.)

71.     Lastly, Bob Musmanno was, at the time, Biotronik's Vice President of Sales for the Western Area – overseeing the Midwest, Southwest, and Western Regions.  In his November 30, 2004 cover memo to Tom Brown, the Executive Vice President of Sales, concerning the "Western Area FY2005 Business Plan," Mr. Musmanno explains:  "Looking forward to FY2005, the Western Area Sales Management Team is united in the few opportunities which exist for us to drive sales revenue to achieve the $45.4 million plan."  He then identifies five opportunities, two of which are:  "*Targeting and driving sales through scientific studies.*"; and "*Driving implants at our AVAIL clinical sites.*"  (Emphases added.)

72.     The map below uses quotations from Biotronik's 2005 Sales Plans to illustrate visually the company's national sales strategy to use scientific/clinical studies to boost sales of Biotronik pacemakers and ICDs:



### 3.   Relator's December 2005 Job Description

73.   Consistent with Biotronik's 2005 Sales Plans, the December 15, 2005 job

description for Relator's position as a Business Development Specialist ("BDS") (2006-2008)

for the company emphasized the importance of using scientific studies to increase product

sales:

> *Scientific Studies are a large part of our product launch strategy.*
> Enrollment has historically been on the shoulders of our repeat
> study sites. The collaboration of a [BDS] offers an opportunity
> to produce a greater number of sites that will participate *with
> consistent enrollment creating more unit growth,* higher ASP's
> [average sales prices], and a stronger collaboration with the
> [sales] rep and customer [physician]. . . . Each [BDS] is
> responsible for *interfacing with the rep on all selling levels to
> promote enrollment* and adoption of HM [home monitoring]
> technology.

"Commission/bonus plan for Home Monitoring Development Specialists" at 1-2 (Dec. 15,

2005) (emphasis added).

74.     The job description also set forth enrollment targets for various scientific studies – TRUST, KRONOS, CYLOS – and provided that compensation would be paid to the Business Development Specialist based, in part, on meeting those enrollment goals. *Id.* at 2. However, certain doctors who were established and repeat enrollers of patients in Biotronik's scientific studies specifically were excluded for purposes of calculating whether the BDS' enrollment goals had been met. *Id.* These repeat-player doctors were Dr. Bill Bailey, Dr. Neelagaru, Dr. John Beard, Dr. Kevin Foley, and Dr. Stephen Ehrlich.

75.     Furthermore, at the outset of the job description, Biotronik stated that "[t]he purpose of this position is to facilitate and develop selling opportunities for our 'Home Monitoring' (HM) platforms." Biotronik then explained that: "The position will be responsible for [*inter alia*] . . . *Improving the enrollment and compliance in scientific studies* using Home Monitoring *in order to widen our customer basis* engaged in those studies." *Id.* at 1 (emphasis added).

### 4.     Biotronik's 2006 and 2009 Sales Plans

76.     Biotronik's marketing strategy of using scientific studies as a "sales tool" to "drive sales" of its products continued throughout Relator's years of employment at the company. And, Biotronik continued to document its unlawful intentions in black and white. For example, in the "2006 Western Area Sales Plan," Biotronik identifies a series of "Strategies" and "Tactics" using scientific studies to increase sales:

> Tactic 2A.     Hire the Business Development Specialist ["BDS"] position for the Western Area to *drive sales in HM through scientific studies* and training of the Western Area sales rep. Each Regional Sales Director ["RSD"] will select 5 target center per TRUST study and the Kronos DRT study for the BDS to *drive sales*.

- 28 -

. . . .

3.   ***Drive Brady sales through the utilization of scientific studies.***

Tactic 3A.   Utilizing the materials developed by the BDS the RSD's will work with the sales reps not targeted to make them more proficient and productive ***in selling and driving pacemaker sales through the scientific studies available.***

Tactic 3B.   ***Continue to drive AVAIL centers to maximize implants*** under the protocol.

. . . .

Tactic 4A.   Utilizing the BDS the RSD's will target 5 accounts to drive [ICD] sales under the Kronos protocol to get a minimum of 2 implants per site.

2006 Western Area Sales Plan (emphases added).

77.   Three years later, the "2009 Western Area Sales Plan" confirmed that Biotronik's *modus operandi* regarding scientific studies had not changed:

3.   ***Drive Tachy*** [ICD] ***sales through the utilization of scientific studies.***

. . . .

Tactic 3B.   ***Continue to drive CELESTIAL and GALAXY as the workhorse protocols*** in 2009 with strong targeted involvement of the BDS working thru the RSD's and with the local [sales] reps.

. . . .

5.   ***Maximize revenue sales of our tachy*** [ICD] ***products*** thru targeted programs that identify those E.P.'s that will provide the largest return for our selling efforts.

Tactic 5A.   ***Continue to drive sales through our scientific studies*** as outlined in the previous strategy. . . .

2009 Western Area Sales Plan (emphases added).

### 5.   Other Compelling Biotronik Documents

78.    On July 14, 2006, Biotronik's Director of Clinical Studies, Kevin Mitchell, sent a company-wide email to all Biotronik employees regarding Biotronik's "Revised Clinical Reimbursement Schedule."  After discussing changes to how checks for scientific studies would be processed, Mr. Mitchell concludes his email: *"Thanks to all sales representatives that utilize Clinical Studies to cultivate their business."* (Emphasis added.)

79.    A few months later, on November 9, 2006, Mr. Mitchell sent an email to the senior sales management – including EVP, Tom Brown and President, Jake Langer – in which he urges more use of the COSMO study to generate sales of Biotronik's Kronos LV-T device, which was an ICD: "The Kronos sales are less than projected and *utilizing the COSMO study* at the currently nominated sites *could be an immediate boost to sales of these devices*."  (Emphases added.)  Regarding sales reps and sites, he advises that "your intervention is necessary if you want COSMO to help you make your [sales] numbers."

80.    On June 26, 2008, Biotronik's Vice President of Sales for the Western United States, Bob Musmanno, sent an email to the regional sales managers in his area entitled, "Scientific Studies – IMPACT/CELESTIAL/ECHO-CRT/CLEAR."  In strident tones, Mr. Musmanno berates his subordinate managers for not doing more to use scientific studies to generate business for the company.  His email begins:  "We have really fumbled the ball when it comes to Scientific Studies in 2008."  He continues:  "You are not paying attention to the studies and so IMPACT is suffering as are our other studies."  He then describes the studies as being "such an important selling tool, " and he exhorts:  "We all have got to focus on recruitment and scientific studies.  They brought in 2007 and they will bring in 2008 [re achieving sales goals]."  He concludes by saying:  "My head is back in the game as far as

scientific studies is concerned and getting each of you to focus on what is going to bring this year in at plan [re achieving sales goals]."

81.     On November 10, 2009, Biotronik's Executive Vice President of Sales, Tom Brown, sent an email to the sales team entitled "Clinical Studies and their Impact on the CRM Business in General," in which he set forth his view that scientific studies are essential for Biotronik to attract business.  At the outset, Mr. Brown opined that "many physician groups [are] looking for ways to legally increase their income stream through clinical studies being offered by all companies in our industry."  He then observed: "In many cases, large groups or individual practitioners will not implant devices unless they are involved in clinical studies."  Therefore, he explained:

> In order to maintain that business relationship [with doctors] we are challenged to continue to offer both brady [pacemaker] and tachy [ICD] *studies that help them to achieve their* scientific *and business goals*.  If we fail to answer the bell, they will look elsewhere, regardless of the business and personal relationship they may have with our representative.
>
> I know I am preaching to the choir here but it is critical that BIOTRONIK remain competitive in the clinical study arena. . . . *Clinical studies remains [sic] one of the best methods for breaking into new accounts and giving the physicians rationale to "try" a new company*. . . .  We must be able to "answer the bell."

(Emphases added.)

### III.     Biotronik's Scientific Studies

82.     Over the last decade, Biotronik has paid <u>tens of millions of dollars</u> to doctors so as to drive sales of the company's cardiac devices (pacemakers and ICDs).  As previously discussed, the fact that Biotronik paid those sums in connection with scientific studies does not immunize the company from anti-kickback or false claims act liability.  The studies,

- 31 -

1 with their attendant financial benefits, were extremely popular with Biotronik's doctors,

2 some of whom were as eager to take Biotronik's money as the company was to provide it.

3 As detailed below, a total of *14,915* patients (if not more) were enrolled in (or planned by

4 Biotronik to be enrolled in) 16 scientific studies funded by Biotronik, for which the company

5
6 paid (or will have paid) approximately *$42 million* to doctors for enrolling patients in those

7 studies. Of those 16 scientific studies, *only two* were requested by the FDA; the *other 14*

8 were "voluntary" studies contrived by Biotronik solely for the purpose of distributing

9 kickbacks to doctors.

10      83.     Most importantly, *all 16* scientific studies were implemented and bankrolled

11
12 by Biotronik as part of its decade-long marketing strategy to use the studies as "sales tools"

13 that would pay large sums of money to doctors (*i.e.*, kickbacks) for the purpose of "driving

14 sales" of its pacemakers and ICDs.  Biotronik usually paid doctors approximately $1,000

15 (enrollment + follow-up visits) for each pacemaker patient enrolled in a study; and paid

16
17 doctors approximately $4,000 (enrollment + follow-up visits) for each ICD patient enrolled

18 in a study. (Biotronik paid doctors more for patients enrolled in ICD studies because the

19 company made much more money for each ICD sale than it did for each pacemaker sale.)

20      84.     Biotronik's kickback expenditures for scientific studies were more than offset

21
22 by the resulting device sales, which were approximately $5,000-$6,000 per pacemaker unit,

23 and $20,000-$25,000 per ICD unit.  Indeed, Biotronik's marketing strategy using scientific

24 studies was remarkably "successful," because the company's $42 million paid to doctors

25 resulted in revenue of approximately *$140 million* from Biotronik cardiac device sales in

26 connection with the company's scientific studies, which are described hereafter.

27

28

85.     Moreover, internal Biotronik sales documents clearly show Biotronik's success in using scientific studies to generate sales and increase Biotronik's market share. With respect to pacemakers, Biotronik sold 9,983 units in 2004. After the company increased its use of scientific studies for pacemakers at the end of 2004, the number of Biotronik pacemakers sold *increased over 50%* to 15,849 for the year 2009. Likewise, and even more pronounced and lucrative, was the effect that scientific studies had on Biotronik's ICD sales. In 2004, Biotronik sold 1,609 ICD units. But after the company augmented its use of scientific studies to boost its ICD sales at the end of 2005, the number of ICDs sold dramatically *increased over 360%* to 7,468 for the year 2009.

A.     **IMPACT**

86.     The IMPACT study, titled "Combined Use of BIOTRONIK Home Monitoring and Predefined Anticoagulation to Reduce Stroke Risk," (NCT00559988) was conducted from February 2008 through June 2013. The study chairs were Jonathan L Halperin, M.D. from Mount Sinai Medical Center in New York, NY, and John Ip, M.D. from the Thoracic & Cardiovascular Healthcare Foundation in Lansing, MI. Biotronik's point of contact was Crystal Miller.

87.     The IMPACT study – which involved a Biotronik ICD – was conducted at 80 sites and had a staggering 2,718 patients enrolled. Biotronik paid doctors approximately $4,000 (if not more) for each enrolled patient. So, in total, Biotronik paid doctors approximately *$10,872,000* for enrolling patients in the IMPACT study.

88.     The IMPACT study was the subject of a December 11, 2008 email from Biotronik's EVP of Sales, Tom Brown, to the company's senior sales management in which he discussed the IMPACT study, and he attached a so-called "Loser List" that identified

doctors and/or centers that had not implanted enough Biotronik devices to satisfy the company's sales goals. (*See*, *supra*, ¶ 59.) Moreover, he expressly scolded the Regional Sales Managers and Vice Presidents of Sales for not getting enough devices implanted via the IMPACT study: "Gentlemen, if you cannot get a minimum of two devices out of a center per month you are wasting our time!" (*Id.*)

89.     In a "reply all" email that same day by Kevin Mitchell, Biotronik's Director of Clinical Sales, he advised: "If they [sites] do not perform for IMPACT, do not nominate them for a future study, they won't be accepted." (*Id.*)

90.     The IMPACT study was one of the scientific studies identified by Bob Musmanno, Vice President of Sales for the Western United States, in his strident June 26, 2008 email to senior sales managers. In that email – which is more fully discussed above in ¶ 80 – Mr. Musmanno complains: "You are not paying enough attention to the studies and so IMPACT is suffering as are our other studies." He then describes scientific studies as being "such an important selling tool" and he declares: "We all have got to focus on recruitment and scientific studies. They brought in 2007 and they will bring in 2008 [re achieving sales goals]."

91.     One of the study chairs, Dr. Ip, received significant compensation from Biotronik studies; indeed, he enrolled his 50th patient in IMPACT by the end of 2009. Another physician, Dr. Romesh Japra, enrolled 42 patients in IMPACT by the end of 2009.

92.     The results of the IMPACT study have never been published.

**B.     EchoCRT**

93.     The EchoCRT study, titled "Echocardiography Guided Cardiac Resynchronization Therapy," (NCT00683696) was conducted from August 2008 through

- 34 -

March 2013.  The principal investigators were William Abraham, M.D. at The Ohio State University, OH, and Jagmeet Singh, M.D. at Massachusetts General Hospital, MA.

94.   The EchoCRT study – which involved a top tier Biotronik ICD – was conducted at 122 sites and had 1,680 enrolled patients.  Biotronik paid doctors approximately $4,000 (if not more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$6,720,000* for enrolling patients in the EchoCRT study.

95.   The EchoCFT study was one of the scientific studies identified by Bob Musmanno, Vice President of Sales for the Western United States, in his strident June 26, 2008 email to senior sales managers.  In that email – which is more fully discussed above in ¶ 80 – Mr. Musmanno complains about the failure to use scientific studies more to drive sales, and he states: "ECHO-Crt is in the same boat."  He then commands his regional sales managers "to drive your [sales] reps and your centers to getting approved and enrolling patients [in the EchoCRT study]."  He also describes scientific studies as being "such an important selling tool" and he declares: "We all have got to focus on recruitment and scientific studies.  They brought in 2007 and they will bring in 2008 [re achieving sales goals]."

C.   **TRUST**

96.   The TRUST study, titled "TRUST:  Lumos-T Safely RedUceS RouTine Office Device Follow-up," (NCT00336284) was conducted from November 2005 through June 2009.  The principal investigator for the TRUST study was Niraj Varma, M.D., F.R.C.P., at The Cleveland Clinic, in Cleveland, Ohio.

97.   The TRUST study – which involved a Biotronik ICD – was conducted at 110 sites and had 1,450 patients enrolled.  Biotronik paid doctors approximately $4,000 (if not

more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$5,800,000* for enrolling patients in the TRUST study.

98.     The TRUST study was one of three scientific studies to which Biotronik expressly tied Relator's compensation when he was hired as a Business Development Specialist.  Biotronik mandated certain enrollment goals for this study, and if Relator failed to achieve the goals, then he would receive less pay.  (*See*, *supra*, ¶ 74.)

99.     Furthermore, in its 2006 Western Area Sales Plan, Biotronik directed that the TRUST study should be used to increase ICD sales:  "Each Regional Sales Director ["RSD"] will select 5 target center per TRUST study and the Kronos DRT study for the BDS to *drive sales*."  (Emphasis added.)  (*See*, *supra*, ¶ 76.)

100.    Some doctors were very receptive to Biotronik's sales efforts.  For example, by April 25, 2006, Dr. Stephen Ehrlich had enrolled more than 100 patients in Biotronik's studies, including TRUST and CLEAR (discussed further below).  On that date, however, he came to the attention of the Western Institutional Review Board, which suspended his involvement in the studies because of its concern that Dr. Ehrlich did not have sufficient staffing to assist him with so many study patients.

**D.     CELESTIAL**

101.    The CELESTIAL study, titled "Post Approval Registry:  Corox OTW, Endocardial, Left Ventricular Steroid Lead, Bipolar Post Approval Registry," (NCT00810264) started in December 2008 and is expected to be completed in October 2018.

102.    CELESTIAL is a post-approval observational study registered with and monitored by the FDA pursuant to PMA approval (P070008).  It is a 10-year, multi-center prospective cohort study designed to follow up to 2,500 patients implanted with

1   BIOTRONIK's Corox OTW(-S) BP left ventricular lead at up to 100 centers around the

2   United States.

3       103.    The CELESTIAL study – which involves a Biotronik ICD – is being conducted

4   at 86 sites and had 588 enrolled patients as of April 2010.  Biotronik paid doctors

5
6   approximately $4,500 for each enrolled patient.  So, in total, Biotronik paid doctors

7   approximately *$2,646,000* for enrolling 588 patients in the CELESTIAL study.  Because the

8   CELESTIAL study was designed to follow up to 2,500 patients, it is likely that the final

9   number of enrolled patients was higher than 588 (the April 2010 number); and, likewise, the

10  final amount of money paid to doctors for enrolling patients in the study was higher too.

11
12      104.    The CELESTIAL study was one of the scientific studies identified by Bob

13  Musmanno, Vice President of Sales for the Western United States, in his strident June 26,

14  2008 email to senior sales managers.  In that email – which is more fully discussed above

15  in ¶ 80 – Mr. Musmanno describes scientific studies as being "such an important selling
16
17  tool" and he declares: "We all have got to focus on recruitment and scientific studies.

18  They brought in 2007 and they will bring in 2008 [re achieving sales goals]."

19      105.    Furthermore, in its 2009 Western Area Sales Plan, Biotronik directed that the

20  CELESTIAL study should be used to increase ICD sales.  Under the "Strategy" entitled,

21  "Drive Tachy [ICD] sales through the utilization of scientific studies," Biotronik included
22
23  the following "Tactic": "Continue to drive CELESTIAL and GALAXY as the workhorse

24  protocols in 2009 . . . ."  (*See, supra*, ¶ 77.)

25      106.    Dr. Lameh Fananapazir (in Biotronik's Central East region) had enrolled 64 of

26  his patients in CELESTIAL by February 2010.  That enrollment earned him $48,000 ($750 per
27
28  patient upon enrollment) and payments of $12,800 every three to six months.  *At the same*

- 37 -

*time*, Dr. Fananapazir had another 24 patients enrolled in the GALAXY study (discussed next) for which he earned another $18,000 in enrollment fees and payments of $4,800 every three to six months.

107.    Another physician, Dr. K. Vijay had enrolled 29 patients in CELESTIAL by September 2009, thereby earning $21,750 in enrollment fees and $5,800 in follow up visits every three to six months.  Dr. William Resh (in Biotronik's Western region) enrolled 19 patients in CELESTIAL *in August 2009 alone*, thereby earning $14,250 that month and follow up payments of $3,800 every three to six months.  In his haste to sign patients up for the study, Dr. Resh had, in many cases, failed to obtain and/or document his patients' consent.  In October 2009, Biotronik noted "multiple informed consent deficiencies."  Yet, despite an absence of evidence that Dr. Resh had obtained his patients' consent to be subjects in the CELESTIAL study, Biotronik did not close that site or even suspend enrollments by Dr. Resh.

E.    **GALAXY**

108.    The GALAXY study, titled "GALAXY Registry:  Long-term Evaluation of the Linox Family ICD Leads Registry," (NCT00836589) began in December 2008 and it will conclude in November 2016.  The GALAXY study was designed to follow up to 2,000 patients.

109.    The GALAXY study – which involves a Biotronik ICD – is being conducted at 86 sites and had 756 enrolled patients as of April 2010.  Biotronik paid doctors approximately $4,500 for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$3,402,000* for enrolling 756 patients in the GALAXY study.  Because the GALAXY study was designed to follow up to 2,000 patients, it is likely that the final

number of enrolled patients was higher than 756 (the April 2010 number); and, likewise, the final amount of money paid to doctors for enrolling patients in the study was higher too.

110.    In its 2009 Western Area Sales Plan, Biotronik directed that the GALAXY study should be used to increase ICD sales.  Under the "Strategy" entitled, "Drive Tachy [ICD] sales through the utilization of scientific studies," Biotronik included the following "Tactic": "Continue to drive CELESTIAL and GALAXY as the workhorse protocols in 2009 . . . ." (*See, supra, ¶ 77.*)

111.    In 2009, Biotronik enrolled 538 patients in the GALAXY study and again, certain doctors across the country were cashing in on Biotronik's largesse.  For example, by February 2010, Dr. Antoine Adem (Missouri) had enrolled 30 of his patients, earning $22,500 in enrollment fees and $6,000 every three to six months; Dr. Monty Morales (Arizona) had enrolled 29, earning $21,750 in enrollment fees and $5,800 in follow up visits every three to six months; Dr. Jeffrey Chen (Louisiana) had enrolled 22 of his patients by the same period earning himself a payment of $16,500 in enrollment fees and rolling payments of $4,400.  By April 2010, Dr. BJ Patel (Alabama) had enrolled 19 patients in GALAXY;  Dr. R. Lutan (Illinois) had enrolled 22; Dr. M. Ciminelli (South Carolina) had enrolled 18; Dr. P. Jayaraj (California) had enrolled 30 (with another 10 patients in the CELESTIAL study).

## F.    REPLACE

112.    The REPLACE study, titled "Prospective Assessment of the Complication Rate After Device Replacement Due to ERI, Advisory or Upgrade," (NCT00395447) was conducted from July 2007 through June 2009.  The principal investigator for the REPLACE study was Jeanne Poole, M.D. from the University of Washington.  Dr. Poole never implanted Biotronik devices prior to her becoming the principal investigator for the

- 39 -

REPLACE study.  Indeed, she was selected as a way for Biotronik to break into the University of Washington market for implantable cardiac devices.

113.    The REPLACE study – which involved both Biotronik pacemakers and ICDs – was conducted at 71 sites and had 1,744 patients enrolled.  Biotronik paid doctors approximately $1,000 (if not more) for each enrolled pacemaker patient, and paid doctors approximately $4,000 (if not more) for each enrolled ICD patient.  So, in total, and assuming an equal number of pacemaker and ICD patients, Biotronik paid doctors approximately *$4,360,000* for enrolling patients in the REPLACE study.

G.    **CLEAR**

114.    The CLEAR study, titled "CLEAR: Cylos Pacemaker Responds With Physiologic Rate Changes During Daily Activities," (NCT00355797) was conducted from May 2006 through December 2010.  The principal investigator for the CLEAR study was Freddy Abi-Samra, M.D., at the Ochsner Health System in New Orleans, Louisiana.

115.    The CLEAR study – which involved a Biotronik pacemaker – was conducted at 99 sites and had 1,491 patients enrolled.  Biotronik paid doctors approximately $1,000 (if not more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$1,491,000* for enrolling patients in the CLEAR study.

116.    The CLEAR study was one of the scientific studies identified by Bob Musmanno, Vice President of Sales for the Western United States, in his strident June 26, 2008 email to senior sales managers.  In that email – which is more fully discussed above in ¶ 80 – Mr. Musmanno describes scientific studies as being "such an important selling tool" and he declares: "We all have got to focus on recruitment and scientific studies.  They brought in 2007 and they will bring in 2008 [re achieving sales goals]."

117.    In fact, 2008 did turn out to be a strong year for the CLEAR study, enrolling 521 patients that year. The following doctors were at the top of the enrollment leader board that year: Dr. N. Sing (Georgia) with 62 patients; Dr. Stephen Ehrlich (California) with 56 patients; Dr. W. Reilly with 39 patients; and Dr. Antoine Adem (Missouri) with 34 patients.

**H.    COSMO**

118.    The COSMO study, titled "Corox OTW Steroid LV Lead Monitoring," (NCT00396136) was conducted from October 2006 through December 2011. COSMO was a post-approval study registered with and monitored by the FDA pursuant to PMA approval (P050023). It was a registry study and was uncontrolled. The principal investigator was undisclosed, but the study director was Katerina de Metz of Biotronik.

119.    The COSMO study – which involved a Biotronik ICD – was conducted at 12 sites and had 221 patients enrolled. Biotronik paid doctors approximately $4,000 (if not more) for each enrolled patient. So, in total, Biotronik paid doctors approximately *$884,000* for enrolling patients in the COSMO study.

120.    The COSMO study was the subject of a November 9, 2006 email from Biotronik's Director of Clinical Studies, Kevin Mitchell, to senior sales management in which he urges more use of the COSMO study to generate sales of Biotronik's Kronos LV-T device, which was an ICD: "The Kronos sales are less than projected and *utilizing the COSMO study* at the currently nominated sites *could be an immediate boost to sales of these devices*." (Emphases added.) (*See, supra,* ¶ 79.)

121.    The results of the COSMO study have never been published.

## I.    **Lumax HF-T**

122.    The Lumax HF-T study, titled "Clinical Investigation to study Safety and Efficacy of the Interventricular Delay Feature of the Lumax HF-T Device for Heart Failure," (NCT00508391) was conducted from July 2007 through August 2009.  The principal investigator was undisclosed, but the study director was Clay Cohorn of Biotronik.

123.    The Lumax HF-T study – which involved a top tier Biotronik ICD – was conducted at 19 sites and had 122 patients enrolled.  Biotronik paid doctors approximately $4,000 (if not more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$488,000* for enrolling patients in the Lumax HF-T study.

124.    The results of the Lumax HF-T study have never been published.

## J.    **TRIAGE-CRT**

125.    The TRIAGE-CRT study, titled "TRIAGE-CRT Telemonitoring in Patients With Congestive Heart Failure and Indication of ICD-Cardiac Resynchronization Therapy," (NCT00395642) was conducted from November 2006 through January 2008.  The principal investigator for the TRIAGE-CRT study was Joseph Akar, M.D. from Loyola University in Chicago, Illinois.

126.    The TRIAGE-CRT study – which involved a Biotronik ICD – was conducted at 13 sites and had 66 patients enrolled.  Biotronik paid doctors approximately $4,000 (if not more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$264,000* for enrolling patients in the TRIAGE-CRT study.

127.    The results of the TRIAGE-CRT study have never been published.

### K.   AVAIL

128.    The AVAIL study, titled "CLS/CRT: AV-node Ablation With CLS and CRT

Pacing Therapies for the Treatment of AF," (NCT00356057) was conducted from December

2004 through June 2008. The principal investigator for the AVAIL study was Michael

Orlov, M.D., at Caritas St. Elizabeth's Medical Center, in Boston, Massachusetts.

129.    The AVAIL study – which involved a Biotronik pacemaker – was conducted

at 10 centers and had 153 patients enrolled.  Biotronik paid doctors approximately $1,000

(if not more) for each enrolled patient. So, in total, Biotronik paid doctors approximately

*$153,000* for enrolling patients in the AVAIL study.

130.    The AVAIL study is one of the studies that Biotronik sales managers

repeatedly identified as being an important "sales tool" to "drive sales" of Brady

pacemakers.  (*See, supra*, ¶¶ 63-65, 69-71, 76.)

131.    The results of the AVAIL study have never been published.

### L.   SIELLO

132.    The SIELLO study, titled "Safety and Performance study of the Siello S Pacing

Lead (SIELLO)," (NCT01791127) is observational study that was started in January 2013 and

is expected to be completed in January 2018.

133.    The SIELLO study – which involves both Biotronik pacemakers and ICDs –

is being conducted at 54 sites and is planned to have 2,124 enrolled patients.  Biotronik

will pay doctors approximately $1,000 (if not more) for each enrolled patient. So, if full

enrollment is achieved, then Biotronik will have paid doctors a total of approximately

*$2,124,000* for enrolling patients in the SIELLO study.

- 43 -

**M.** **ProMRI (Entovis)**

134.   ProMRI (Entovis) study, titled "ProMRI study of the Entovis Pacemaker System," (NCT01761162) is a study that was started in February 2013 and completed in May 2014.

135.   The ProMRI (Entovis) study – which involved a Biotronik pacemaker – was conducted at 25 sites and had 150 enrolled patients.  Biotronik paid doctors approximately $1,000 (if not more) for each enrolled patient.  So, in total, Biotronik paid doctors approximately *$150,000* for enrolling patients in the ProMRI (Entovis) study.

**N.** **ProMRI (Entovis Phase B)**

136.   ProMRI (Entovis Phase B) study, titled "ProMRI study of the Entovis Pacemaker System (Phase B)," (NCT02009696) is a study that was started in December 2013 and is expected to be completed in December 2014.

137.   The ProMRI (Entovis Phase B) study – which involves a Biotronik pacemaker – is being conducted at 32 sites and is planned to have 245 enrolled patients.  Biotronik will pay doctors approximately $1,000 (if not more) for each enrolled patient.  So, if full enrollment is achieved, then Biotronik will have paid doctors a total of approximately *$245,000* for enrolling patients in the ProMRI (Entovis Phase B) study.

**O.** **ProMRI (Iforia Phase C)**

138.   ProMRI (Iforia Phase C) study, titled "ProMRI study of the Iforia ICD System (Phase C)," (NCT02096692) is a study that was started in June 2014 and it is expected to be completed in April 2015.

139.   The ProMRI (Iforia Phase C) study – which involves a Biotronik ICD – is being conducted at 1 location and is planned to have 172 enrolled patients.  Biotronik

- 44 -

1   will pay doctors approximately $4,000 (if not more) for each enrolled patient. So, if full

2   enrollment is achieved, then Biotronik will have paid doctors a total of approximately

3   *$688,000* for enrolling patients in the ProMRI (Iforia Phase C) study.

**P.   SENSE**

4

5   140.   The SENSE study, titled "Sensing Atrial High Rate Episodes With DX System

6   in Implantable Cardioverter Defibrillators Trial," (NCT02186704) is a study that was started

7   in July 2014 and is expected to be completed in January 2017. The principal investigators

8   are George Thomas, M.D. and Jim Cheung, M.D.

9

10   141.   The SENSE study – which involves a Biotronik ICD – is being conducted

11   at 1 location and is planned to have 450 enrolled patients. Biotronik will pay doctors

12   approximately $4,000 (if not more) for each enrolled patient. So, if full enrollment is

13   achieved, then Biotronik will have paid doctors a total of approximately *$1,800,000*

14   for enrolling patients in the SENSE study.

15

16

17                                    **DAMAGES**

18   142.   Defendant Biotronik's actions detailed herein have caused the submission

19   of false and/or fraudulent claims to the United States, the Plaintiff States, and the District.

20   Defendant Biotronik and its senior management knew that the abuse of scientific studies

21   in the manner described in this Complaint was a breach of the Anti-Kickback Statute that

22   would result in false claims being submitted to federal and state governments. Indeed, the

23   Defendant's business model was premised upon such abuse.

24

25   143.   As a result of Defendant's actions, the United States, the Plaintiff States, and

26   the District have suffered significant financial injury, the most modest measure of which is

27

28

the total value of the kickbacks in question, which amounts to approximately *$42 million* in "single damages" – *i.e.*, before trebling under applicable law, which results in recoverable damages of *$126 million*. In the alternative, Relator concurrently seeks the higher measure of damages, which is the aggregate value of the false claims submitted to, and paid by, the United States, the Plaintiff States, and the District. The "single damages" amount for that calculation is approximately *$112 million*, which is a conservative estimate based on 80% of Biotronik's $140 million of cardiac device sales resulting in actionable false claims (and also disregarding and reserving for proof at trial the fact that this $112 million in device sales likely resulted in a far larger dollar amount of false claims being billed to Government Health Care Programs). That amount, when trebled, is *$336 million*. Relator also seeks statutory penalties, attorneys' fees, costs of suit, and/or other relief, as more fully described below.

## LEGAL CLAIMS FOR RELIEF

144.   Relator alleges that Defendant Biotronik's conduct detailed above violates the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (Count I), and violates the analog false claims acts of the Plaintiff States and the District (Counts II-XXX). He brings these claims on behalf of the United States, the Plaintiff States, and the District, as well as on his own behalf.

/ / /

/ / /

/ / /

/ / /

## CLAIM ON BEHALF OF THE UNITED STATES

### COUNT I
Federal False Claims Act
31 U.S.C. § 3729, *et seq.*
False Claims Based on Illegal Kickbacks

145.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 144 as if fully set forth herein.

146.    This is a claim for treble damages and penalties against Defendant Biotronik under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

147.    As described above, Defendant Biotronik provided unlawful financial inducements to health care providers to generate sales of Defendant's products in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  Such financial inducements included, without limitation, using Biotronik-sponsored scientific studies as a marketing tool to financially reward physicians who used Biotronik's products.  Biotronik paid those physicians <u>tens of millions of dollars</u> to enroll patients in scientific studies so as to increase sales of Biotronik's cardiac devices (pacemakers and ICDs).

148.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, in violation of federal law.

149.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the United States to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of federal law.

- 47 -

150. The United States – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

151. By reason of Defendant Biotronik's conduct, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

152. Pursuant to federal law, the United States is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

153. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by federal law, Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

## CLAIMS ON BEHALF OF THE PLAINTIFF STATES AND THE DISTRICT

### COUNT II
California False Claims Act
Cal. Gov't. Code § 12650, *et seq.*

154. Relator repeats and realleges the allegations set forth in paragraphs 1 through 153 as if fully set forth herein.

155. This is a claim for treble damages and penalties against Defendant Biotronik under the California False Claims Act, Cal. Gov't. Code § 12650, *et seq.*

156. By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of California, in violation of California law.

- 48 -
COMPLAINT

157. By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of California to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of California law.

158. The State of California – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

159. By reason of Defendant Biotronik's conduct, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

160. Pursuant to California law, the State of California is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

161. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by California law, Relator is entitled to a "relator's share" of any recovery obtained by the State of California (and/or the federal government) as a result of this claim.

## COUNT III
### Colorado Medicaid False Claims Act
### Col. Rev. Stat. § 25.5-4-303.5, *et seq.*

162. Relator repeats and realleges the allegations set forth in paragraphs 1 through 161 as if fully set forth herein.

- 49 -

163.    This is a claim for treble damages and penalties against Defendant Biotronik under the Colorado Medicaid False Claims Act, Col. Rev. Stat. § 25.5-4-303.5, *et seq.*

164.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Colorado, in violation of Colorado law.

165.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Colorado to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Colorado law.

166.    The State of Colorado – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

167.    By reason of Defendant Biotronik's conduct, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

168.    Pursuant to Colorado law, the State of Colorado is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

169.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Colorado law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Colorado (and/or the federal government) as a result of this claim.

**COUNT IV**
Connecticut False Claims Act
Conn. Gen. Stat. §17b-301a, *et seq.*

170.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 169 as if fully set forth herein.

171.    This is a claim for treble damages and penalties against Defendant Biotronik under the Connecticut False Claims Act, Conn. Gen. Stat. §17b-301a, *et seq.*

172.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Connecticut, in violation of Connecticut law.

173.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Connecticut to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Connecticut law.

174.    The State of Connecticut – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

175.    By reason of Defendant Biotronik's conduct, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

176.    Pursuant to Connecticut law, the State of Connecticut is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

177.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Connecticut law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Connecticut (and/or the federal government) as a result of this claim.

**COUNT V**
Delaware False Claims and False Reporting Act
6 Del. C. § 1201, *et seq.*

178.   Relator repeats and realleges the allegations set forth in paragraphs 1 through 177 as if fully set forth herein.

179.   This is a claim for treble damages and penalties against Defendant Biotronik under the Delaware False Claims and False Reporting Act, 6 Del. C. § 1201, *et seq.*

180.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Delaware, in violation of Delaware law.

181.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Delaware to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Delaware law.

182.   The State of Delaware – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

183.    By reason of Defendant Biotronik's conduct, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

184.    Pursuant to Delaware law, the State of Delaware is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

185.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Delaware law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Delaware (and/or the federal government) as a result of this claim.

### COUNT VI
District of Columbia Procurement Act
D.C. Code § 2-308.13, *et seq.*

186.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 185 as if fully set forth herein.

187.    This is a claim for treble damages and penalties against Defendant Biotronik under the District of Columbia Procurement Act, D.C. Code § 2-308.13, *et seq.*

188.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the District of Columbia, in violation of District of Columbia law.

189.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the District of Columbia to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of District of Columbia law.

190.     The District of Columbia – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

191.     By reason of Defendant Biotronik's conduct, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

192.     Pursuant to District of Columbia law, the District of Columbia is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

193.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by District of Columbia law, Relator is entitled to a "relator's share" of any recovery obtained by the District of Columbia (and/or the federal government) as a result of this claim.

## COUNT VII
Florida False Claims Act
Fla. Stat. Ann. § 68.081, *et seq.*

194.     Relator repeats and realleges the allegations set forth in paragraphs 1 through 193 as if fully set forth herein.

195.     This is a claim for treble damages and penalties against Defendant Biotronik under the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.*

- 54 -

196.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Florida, in violation of Florida law.

197.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Florida to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Florida law.

198.   The State of Florida – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

199.   By reason of Defendant Biotronik's conduct, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

200.   Pursuant to Florida law, the State of Florida is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

201.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Florida law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Florida (and/or the federal government) as a result of this claim.

## COUNT VIII
Georgia False Medicaid Claims Act
Ga. Code Ann. § 49-4-168, *et seq.*

202.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 201 as if fully set forth herein.

203.    This is a claim for treble damages and penalties against Defendant Biotronik under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*

204.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Georgia, in violation of Georgia law.

205.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Georgia to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Georgia law.

206.    The State of Georgia – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

207.    By reason of Defendant Biotronik's conduct, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

208.    Pursuant to Georgia law, the State of Georgia is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false

or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

209.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Georgia law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Georgia (and/or the federal government) as a result of this claim.

## COUNT IX
Hawaii False Claims Act
Haw. Rev. Stat. § 661-21, *et seq.*

210.   Relator repeats and realleges the allegations set forth in paragraphs 1 through 209 as if fully set forth herein.

211.   This is a claim for treble damages and penalties against Defendant Biotronik under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, *et seq.*

212.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Hawaii, in violation of Hawaii law.

213.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Hawaii to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Hawaii law.

214.   The State of Hawaii – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by

Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

215.    By reason of Defendant Biotronik's conduct, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

216.    Pursuant to Hawaii law, the State of Hawaii is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

217.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Hawaii law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Hawaii (and/or the federal government) as a result of this claim.

**COUNT X**
Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat. § 175/1, *et seq.*

218.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 217 as if fully set forth herein.

219.    This is a claim for treble damages and penalties against Defendant Biotronik under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1, *et seq.*

220.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Illinois, in violation of Illinois law.

221.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Illinois to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Illinois law.

222.   The State of Illinois – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

223.   By reason of Defendant Biotronik's conduct, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

224.   Pursuant to Illinois law, the State of Illinois is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

225.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Illinois law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Illinois (and/or the federal government) as a result of this claim.

**COUNT XI**
Indiana False Claims and Whistleblower Protection Act
Ind. Code Ann. § 5-11-5.5-1, *et seq.*

226.   Relator repeats and realleges the allegations set forth in paragraphs 1 through 225 as if fully set forth herein.

227.     This is a claim for treble damages and penalties against Defendant Biotronik under the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-1, *et seq.*

228.     By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Indiana, in violation of Indiana law.

229.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Indiana to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Indiana law.

230.     The State of Indiana – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

231.     By reason of Defendant Biotronik's conduct, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

232.     Pursuant to Indiana law, the State of Indiana is entitled to three times the amount of actual damages, plus the maximum penalty of $5,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

233.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by Indiana law, Relator is entitled to a "relator's

share" of any recovery obtained by the State of Indiana (and/or the federal government) as a result of this claim.

### COUNT XII
Iowa Medicaid False Claims Act
Iowa Code § 685, *et seq.*

234.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 233 as if fully set forth herein.

235.    This is a claim for treble damages and penalties against Defendant Biotronik under the Iowa Medicaid False Claims Act, Iowa Code § 685, *et seq.*

236.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Iowa, in violation of Iowa law.

237.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Iowa to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Iowa law.

238.    The State of Iowa – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

239.    By reason of Defendant Biotronik's conduct, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

240.    Pursuant to Iowa law, the State of Iowa is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or

fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

241.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Iowa law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Iowa (and/or the federal government) as a result of this claim.

## COUNT XIII
Louisiana Medical Assistance Programs Integrity Law
46 La. Rev. Stat., ch. 3 § 437.1, *et seq.*

242.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 241 as if fully set forth herein.

243.    This is a claim for treble damages and penalties against Defendant Biotronik under the Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat., ch. 3 § 437.1, *et seq.*

244.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Louisiana, in violation of Louisiana law.

245.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Louisiana to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Louisiana law.

246.    The State of Louisiana – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by

Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

247.   By reason of Defendant Biotronik's conduct, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

248.   Pursuant to Louisiana law, the State of Louisiana is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

249.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Louisiana law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Louisiana (and/or the federal government) as a result of this claim.

## COUNT XIV
### Maryland False Health Claims Act
### Md. Code Ann., Health-Gen. § 2-601, *et seq.*

250.   Relator repeats and realleges the allegations set forth in paragraphs 1 through 249 as if fully set forth herein.

251.   This is a claim for treble damages and penalties against Defendant Biotronik under the Maryland False Health Claims Act, Md. Code Ann., Health-Gen.

§ 2-601, *et seq.*

252.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Maryland, in violation of Maryland law.

253. By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Maryland to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Maryland law.

254. The State of Maryland – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

255. By reason of Defendant Biotronik's conduct, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

256. Pursuant to Maryland law, the State of Maryland is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

257. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by Maryland law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Maryland (and/or the federal government) as a result of this claim.

**COUNT XV**
Massachusetts False Claims Law
Mass. Gen. Laws, ch. 12 § 5A, *et seq.*

258. Relator repeats and realleges the allegations set forth in paragraphs 1 through 257 as if fully set forth herein.

- 64 -

259.    This is a claim for treble damages and penalties against Defendant Biotronik under the Massachusetts False Claims Law, Mass. Gen. Laws, ch. 12 § 5A, *et seq.*

260.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth of Massachusetts, in violation of Massachusetts law.

261.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the Commonwealth of Massachusetts to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Massachusetts law.

262.    The Commonwealth of Massachusetts – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

263.    By reason of Defendant Biotronik's conduct, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

264.    Pursuant to Massachusetts law, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

265.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Massachusetts law, Relator is entitled to a "relator's share" of any recovery obtained by the Commonwealth of Massachusetts (and/or the federal government) as a result of this claim.

**COUNT XVI**
Michigan Medicaid False Claim Act
Mich. Comp. Laws § 400.601, *et seq.*

266.     Relator repeats and realleges the allegations set forth in paragraphs 1 through 265 as if fully set forth herein.

267.     This is a claim for treble damages and penalties against Defendant Biotronik under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601, *et seq.*

268.     By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Michigan, in violation of Michigan law.

269.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Michigan to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Michigan law.

270.     The State of Michigan – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

271.     By reason of Defendant Biotronik's conduct, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

272.    Pursuant to Michigan law, the State of Michigan is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

273.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Michigan law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Michigan (and/or the federal government) as a result of this claim.

**COUNT XVII**
Minnesota False Claims Act
Minn. Stat. § 15C.01, *et seq.*

274.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 273 as if fully set forth herein.

275.    This is a claim for treble damages and penalties against Defendant Biotronik under the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.*

276.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Minnesota, in violation of Minnesota law.

277.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Minnesota to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Minnesota law.

278.    The State of Minnesota – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by

- 67 -

Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

279.    By reason of Defendant Biotronik's conduct, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

280.    Pursuant to Minnesota law, the State of Minnesota is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

281.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Minnesota law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Minnesota (and/or the federal government) as a result of this claim.

**COUNT XVIII**
Montana False Claims Act
Mont. Code Ann. § 17-8-401, *et. seq.*

282.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 281 as if fully set forth herein.

283.    This is a claim for treble damages and penalties against Defendant Biotronik under the Montana False Claims Act, Mont. Code Ann. § 17-8-401, *et seq.*

284.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Montana, in violation of Montana law.

285.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of

- 68 -

Montana to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Montana law.

286.    The State of Montana – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

287.    By reason of Defendant Biotronik's conduct, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

288.    Pursuant to Montana law, the State of Montana is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

289.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Montana law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Montana (and/or the federal government) as a result of this claim.

## COUNT XIX
### Nevada False Claims Act
### Nev. Rev. Stat. Ann. § 357.010, *et seq.*

290.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 289 as if fully set forth herein.

291.    This is a claim for treble damages and penalties against Defendant Biotronik under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*

- 69 -

292.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Nevada, in violation of Nevada law.

293.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Nevada to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Nevada law.

294.   The State of Nevada – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

295.   By reason of Defendant Biotronik's conduct, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

296.   Pursuant to Nevada law, the State of Nevada is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

297.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Nevada law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Nevada (and/or the federal government) as a result of this claim.

**COUNT XX**
New Jersey False Claims Act
N.J. Stat. § 2A:32C-1, *et seq.*

298.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 297 as if fully set forth herein.

299.    This is a claim for treble damages and penalties against Defendant Biotronik under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.*

300.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of New Jersey, in violation of New Jersey law.

301.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of New Jersey to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of New Jersey law.

302.    The State of New Jersey – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

303.    By reason of Defendant Biotronik's conduct, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

304.    Pursuant to New Jersey law, the State of New Jersey is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

- 71 -

305.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by New Jersey law, Relator is entitled to a "relator's share" of any recovery obtained by the State of New Jersey (and/or the federal government) as a result of this claim.

## COUNT XXI
New Mexico Medicaid False Claims Act
N.M. Stat. Ann. § 27-14-1, *et seq.*

306.     Relator repeats and realleges the allegations set forth in paragraphs 1 through 305 as if fully set forth herein.

307.     This is a claim for treble damages and penalties against Defendant Biotronik under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1, *et seq.*

308.     By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of New Mexico, in violation of New Mexico law.

309.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of New Mexico to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of New Mexico law.

310.     The State of New Mexico – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

311.     By reason of Defendant Biotronik's conduct, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

312.    Pursuant to New Mexico law, the State of New Mexico is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

313.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by New Mexico law, Relator is entitled to a "relator's share" of any recovery obtained by the State of New Mexico (and/or the federal government) as a result of this claim.

## COUNT XXII
### New York False Claims Act
### N.Y. State Fin. § 187, *et seq.*

314.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

315.    This is a claim for treble damages and penalties against Defendant Biotronik under the New York False Claims Act, N.Y. State Fin. § 187, *et seq.*

316.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of New York, in violation of New York law.

317.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of New York to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of New York law.

- 73 -

318.    The State of New York – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

319.    By reason of Defendant Biotronik's conduct, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

320.    Pursuant to New York law, the State of New York is entitled to three times the amount of actual damages, plus the maximum penalty of $12,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

321.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by New York law, Relator is entitled to a "relator's share" of any recovery obtained by the State of New York (and/or the federal government) as a result of this claim.

**COUNT XXIII**
North Carolina False Claims Act
N.C. Gen. Stat. § 1-605, *et seq.*

322.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 321 as if fully set forth herein.

323.    This is a claim for treble damages and penalties against Defendant Biotronik under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*

324.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of North Carolina, in violation of North Carolina law.

325.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of North Carolina to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of North Carolina law.

326.     The State of North Carolina – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

327.     By reason of Defendant Biotronik's conduct, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

328.     Pursuant to North Carolina law, the State of North Carolina is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

329.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by North Carolina law, Relator is entitled to a "relator's share" of any recovery obtained by the State of North Carolina (and/or the federal government) as a result of this claim.

**COUNT XXIV**
Oklahoma Medicaid False Claims Act
Okla. Stat., tit. 63 § 5053, *et seq.*

330.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 329 as if fully set forth herein.

331.    This is a claim for treble damages and penalties against Defendant Biotronik under the Oklahoma Medicaid False Claims Act, Okla. Stat., tit. 63 § 5053, *et seq.*

332.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Oklahoma, in violation of Oklahoma law.

333.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Oklahoma to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Oklahoma law.

334.    The State of Oklahoma – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

335.    By reason of Defendant Biotronik's conduct, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

336.    Pursuant to Oklahoma law, the State of Oklahoma is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

337.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Oklahoma law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Oklahoma (and/or the federal government) as a result of this claim.

**COUNT XXV**
Rhode Island False Claims Act
R.I. Gen. Laws § 9-1.1-1, *et seq.*

338.   Relator repeats and realleges the allegations set forth in paragraphs 1 through 337 as if fully set forth herein.

339.   This is a claim for treble damages and penalties against Defendant Biotronik under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et seq.*

340.   By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Rhode Island, in violation of Rhode Island law.

341.   By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Rhode Island to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Rhode Island law.

342.   The State of Rhode Island – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

343.    By reason of Defendant Biotronik's conduct, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

344.    Pursuant to Rhode Island law, the State of Rhode Island is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

345.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Rhode Island law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Rhode Island (and/or the federal government) as a result of this claim.

**COUNT XXVI**
Tennessee Medicaid False Claims Act
Tenn. Code Ann. § 71-5-181, *et seq.*

346.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 345 as if fully set forth herein.

347.    This is a claim for treble damages and penalties against Defendant Biotronik under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*

348.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Tennessee, in violation of Tennessee law.

349.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Tennessee to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Tennessee law.

350.     The State of Tennessee – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

351.     By reason of Defendant Biotronik's conduct, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

352.     Pursuant to Tennessee law, the State of Tennessee is entitled to three times the amount of actual damages, plus the maximum penalty of $25,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

353.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Tennessee law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Tennessee (and/or the federal government) as a result of this claim.

/ / /

/ / /

/ / /

/ / /

**COUNT XXVII**
Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

354.     Relator repeats and realleges the allegations set forth in paragraphs 1 through 353 as if fully set forth herein.

355.     This is a claim for treble damages and penalties against Defendant Biotronik under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

356.     By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Texas, in violation of Texas law.

357.     By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Texas to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Texas law.

358.     The State of Texas – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

359.     By reason of Defendant Biotronik's conduct, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

360.     Pursuant to Texas law, the State of Texas is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

1   361.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred

2   in bringing this action.  And, as provided by Texas law, Relator is entitled to a "relator's

3   share" of any recovery obtained by the State of Texas (and/or the federal government) as a

4   result of this claim.

5

6                                **COUNT XXVIII**
                          Virginia Fraud Against Taxpayers Act
7                          Va. Code Ann. § 8.01-216.1, *et seq.*

8   362.   Relator repeats and realleges the allegations set forth in paragraphs 1 through

9

10   361 as if fully set forth herein.

11   363.   This is a claim for treble damages and penalties against Defendant Biotronik

12   under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

13   364.   By virtue of the conduct described above, Defendant Biotronik knowingly

14
     presented, or caused to be presented, false or fraudulent claims for payment or approval to
15

16   the Commonwealth of Virginia, in violation of Virginia law.

17   365.   By virtue of the conduct described above, Defendant Biotronik knowingly

18   made, used, or caused to be made or used, false records or statements to induce the

19   Commonwealth of Virginia to pay or approve false or fraudulent claims, and/or that were
20

21   material to such false or fraudulent claims, in violation of Virginia law.

22   366.   The Commonwealth of Virginia – unaware of the falsity of the records,

23   statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or

24   presented, by Defendant Biotronik – paid and continues to pay claims that would not be
25

26   paid but for Defendant's conduct as alleged herein.

27

28

367.    By reason of Defendant Biotronik's conduct, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

368.    Pursuant to Virginia law, the Commonwealth of Virginia is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

369.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Virginia law, Relator is entitled to a "relator's share" of any recovery obtained by the Commonwealth of Virginia (and/or the federal government) as a result of this claim.

**COUNT XXIX**
Washington Medicaid Fraud False Claims Act
Wash. Rev. Code § 74.66.020, *et seq.*

370.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 369 as if fully set forth herein.

371.    This is a claim for treble damages and penalties against Defendant Biotronik under the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.020, *et seq.*

372.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Washington, in violation of Washington law.

373.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Washington to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Washington law.

374.    The State of Washington – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

375.    By reason of Defendant Biotronik's conduct, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

376.    Pursuant to Washington law, the State of Washington is entitled to three times the amount of actual damages, plus the maximum penalty of $11,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

377.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action.  And, as provided by Washington law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Washington (and/or the federal government) as a result of this claim.

**COUNT XXX**
Wisconsin False Claims for Medical Assistance Law
Wis. Stat. § 20.931, *et seq.*

378.    Relator repeats and realleges the allegations set forth in paragraphs 1 through 377 as if fully set forth herein.

1
2

379.    This is a claim for treble damages and penalties against Defendant Biotronik under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931, *et seq.*

3
4
5
6

380.    By virtue of the conduct described above, Defendant Biotronik knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Wisconsin, in violation of Wisconsin law.

7
8
9
10
11

381.    By virtue of the conduct described above, Defendant Biotronik knowingly made, used, or caused to be made or used, false records or statements to induce the State of Wisconsin to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Wisconsin law.

12
13
14
15
16

382.    The State of Wisconsin – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant Biotronik – paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

17
18

383.    By reason of Defendant Biotronik's conduct, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

19
20
21
22
23

384.    Pursuant to Wisconsin law, the State of Wisconsin is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant Biotronik, as alleged herein.

24
25
26
27
28

385.    In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by Wisconsin law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Wisconsin (and/or the federal government) as a result of this claim.

## CONCLUSION

**WHEREFORE,** Plaintiff-Relator Max Bennett, on behalf of the United States, the Plaintiff States, and the District, and on his own behalf, hereby prays that this Court:

1.  Enter judgment against Defendant Biotronik holding it liable for three times the amount of damages sustained by the United States because of Defendant's conduct;

2.  Enter judgment against Defendant Biotronik holding it liable for a civil penalty of $11,000 for each violation of the Federal False Claims Act committed by Defendant;

3.  Enter judgment against Defendant Biotronik holding it liable for three times the amount of damages sustained by the Plaintiff States and the District because of Defendant's conduct, as provided for under the false claims acts of the Plaintiff States and the District;

4.  Enter judgment against Defendant Biotronik holding it liable for the maximum civil penalties permitted for each violation of the false claims acts of the Plaintiff States and the District;

5.  Enter judgment against Defendant Biotronik awarding Relator a percentage of the proceeds recovered by the United States as a result of this action in accordance with 31 U.S.C. § 3730(d);

6.  Enter judgment against Defendant Biotronik awarding Relator a percentage of the proceeds recovered by the Plaintiff States and the District as a result of this action in accordance with the false claims acts of the Plaintiff States and the District;

7. Enter judgment against Defendant Biotronik awarding Relator his costs of suit and attorneys' fees for prosecuting this action in accordance with 31 U.S.C. § 3730(d) and similar provisions in the false claims acts of the Plaintiff States and the District;

8. Enter judgment against Defendant Biotronik awarding any and all other relief that the Court finds to be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff-Relator Max Bennett demands trial by jury on all counts in this action.

Respectfully submitted,

Dated:  October 11, 2014



Charles F. Kester (SBN 157763)
DELANEY KESTER LLP
4505 Las Virgenes Road, Suite 203
Calabasas, California 91302
(818) 974-8627
charles@delaneykester.com

*-and-*

Royston H. Delaney (*Of Counsel*)
Ilyas J. Rona (*Of Counsel*)
DELANEY KESTER LLP
Seven Liberty Square, 2nd Floor
Boston, Massachusetts 02109
(857) 498-0384
royston@delaneykester.com
ilyas@delaneykester.com

*Attorneys for Plaintiff-Relator Max Bennett*

- 86 -