1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  THE UNITED STATES OF AMERICA et        No.  2:14-cv-02407-KJM-EFB
    al. ex rel. MAX BENNETT,
12
                    Plaintiffs,
13                                         ORDER
          v.
14
    BIOTRONIK, INC.,
15
                    Defendant.
16

17

18          Max Bennett alleges his former employer, Biotronik Inc., illegally paid tens of

19  millions of dollars to physicians to bribe them into prescribing Biotronik's medical devices.  He

20  brings this *qui tam* lawsuit on behalf of the federal government, twenty-eight state governments,

21  and the District of Columbia, claiming the kickback scheme led to the submission of many false

22  claims for payment under government programs in violation of the federal False Claims Act

23  (FCA) and related state statutes.

24          Biotronik moves to dismiss the complaint under Federal Rule of Civil Procedure

25  12(b)(6).  The matter was initially submitted for decision without a hearing, but the court reset the

26  matter for oral argument on its own motion.  Charles Kester and Roy Delaney appeared for

27  Bennett, and Megan Jeschke and Christopher Meyers appeared for Biotronik.  As described

28  below, the motion is granted.

                                            1

1    I.      JUDICIAL NOTICE

2            As a preliminary matter, Biotronik requests the court take judicial notice of several

3    documents filed in two related cases.  On a motion to dismiss, the court may consider proper

4    subjects of judicial notice without converting the motion into one for summary judgment.  *See,*

5    *e.g.*, *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012).  Judicial notice is

6    appropriate when a fact "can be accurately and readily determined from sources whose accuracy

7    cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The party who requests judicial notice

8    bears the burden of persuasion to show the matter in question meets the description of Rule 201.

9    *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011).

10           Court filings and orders in related litigation may be subject to judicial notice.  *See,*

11   *e.g.*, *Asdar Grp. v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996).  These

12   documents are often relevant to establish a statement was made at a particular time or that a court

13   undertook a particular judicial act.  *See, e.g.*, *Neilson v. Union Bank of California, N.A.*,

14   290 F. Supp. 2d 1101, 1113 (C.D. Cal. 2003); *Cactus Corner, LLC v. U.S. Dep't of Agric.*,

15   346 F. Supp. 2d 1075, 1100 (E.D. Cal. 2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006).  But absent

16   some other assurance that the accuracy of these documents' contents is subject to no dispute, the

17   truth of allegations, statements, or arguments in court filings fall outside the parameters of

18   Rule 201.  *See, e.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001); *Cactus Corner*,

19   346 F. Supp. 2d at 1100.

20           Here, Biotronik requests judicial notice of several filings in the 2009 *qui tam* FCA

21   case filed by relator Brian Sant, *United States* ex rel. *Sant v. Biotronik, Inc.* (*Sant v. Biotronik*),

22   No. 09-3617 (E.D. Cal. filed Dec. 31, 2009), and the previous *qui tam* case Bennett filed in

23   Nevada, which was transferred to this district, *United States* ex rel. *Bennett v. Biotronik, Inc.*

24   (*Bennett I*), No. 10-1273 (E.D. Cal. filed Mar. 31, 2010).  *See* Req. J. Notice, ECF No. 44.[1]

25   /////

26   _____

27          [1] Any citations to documents from these previous cases are accompanied by the relevant
     case name, whereas citations to documents filed in this action are not designated with a case

28   number or name.

2

Bennett opposes the request only to the extent Biotronik relies on the truth of the allegations, arguments, and other statements in those filings.  *See generally* Opp'n J. Notice, ECF No. 47.

Biotronik's request is granted in part: the court takes judicial notice that the documents cited were filed in related litigation, that this and the Nevada District Court undertook the actions described in them, and that the statements those documents report were made at that time.  But the court does not take judicial notice of the truth of any facts or arguments made in those filings.  Biotronik has not shown those filings' accuracy is subject to no reasonable dispute.

II.     BACKGROUND

        A.     The *Sant* Litigation

            Brian Sant filed a *qui tam* FCA complaint on behalf the United States and several other states in December 2009.  *See* Redacted Compl. at 1, *Sant v. Biotronik*, ECF No. 85.  He alleged Biotronik engaged in a broad range of wrongful conduct, among other things, bribes in the form of paid speaking engagements, *id.* ¶ 4; promotion of unapproved and unnecessary medical devices, *id.* ¶¶ 4–5; creation of a "speakers bureau" and "advisory boards" meant to funnel illegal payments to physicians, *id.* ¶ 34; payments to doctors "for sham 'studies' and 'training,'" *id.* ¶ 38; bribes disguised as "research payments," *id.* ¶ 39; and a number of other bribes, such as sports tickets, gift cards, expensive meals, Broadway plays, the opera, and extravagant travel, *id.* ¶¶ 54, 58.

            Of note here are Sant's claims that Biotronik used bogus clinical studies as a means of paying kickbacks to physicians who prescribed its cardiac rhythm management (CRM) devices, such as pacemakers and implantable cardiac defibrillators (ICDs).  *See id.* ¶¶ 2, 38.  Sant alleged Biotronik paid individual physicians to enroll their patients in these studies, which had little or no scientific or medical value but brought Biotronik plentiful new business.  *Id.* ¶¶ 28, 34, 39.  Biotronik allegedly focused so heavily on finances, rather than patient safety or science, that it tasked its sales force with the recruitment of physicians to lead these studies.  *Id.* ¶ 28.  The sales team based its decisions not on the doctors' knowledge or skill, but on each physician's "volume of implants," "loyalty to Biotronik," and "ability to bring new business."  *Id.*  The quid pro quo arrangement was in some instances so transparent that physicians would not recommend

1   Biotronik devices unless Biotronik paid them to enroll patients in these studies.  *See id.* ¶ 39.

2   Sant named two physicians who regularly received kickbacks under this scheme, *see id.* ¶¶ 41-42,

3   and alleged he possessed copies of Biotronik's payment schedules for physicians participating in

4   four specific studies.[2]  *Id.* ¶ 39.

5            After nearly four years investigating the complaint's allegations, on May 14, 2014,

6   the United States intervened and informed the court it had reached a settlement agreement with

7   Biotronik and Sant, but only with respect to claims predicated on certain "covered conduct."

8   *Sant v. Biotronik*, ECF No. 51.  In short, the settlement agreement referred only to claims that

9   Biotronik awarded doctors "repeated meals at expensive restaurants and monthly payments for

10   membership on a physician advisory board without proper documentation of any specific work

11   performed," all essentially in return for implanting Biotronik's devices.  Settlement Agreement,

12   Myers Decl. Ex. 1, ¶ E, *Sant v. Biotronik*, ECF No. 104-1.  On the parties' stipulation, the case

13   was dismissed on June 5, 2014.  Order on Joint Stip. of Dismissal, *Sant v. Biotronik*, ECF No. 69.

14   With respect to Sant, dismissal was with prejudice.  *Id.*  With respect to the United States, the

15   case was dismissed with prejudice as to the conduct covered by the parties' settlement agreement

16   and without prejudice with respect to any other conduct.  *Id.*

17            B.    Bennett's First Complaint

18            In March 2010, Bennett filed a complaint in the United States District Court for

19   the District of Nevada.  *See* Compl., ECF No. 1; Redacted Third Amend. Compl., *Bennett I*

20   (*Bennett I* Compl.), ECF No. 92.  He alleged Biotronik "employed a variety of methods of

21   offering and transferring value to physicians and others to induce the purchase of Biotronik

22   products."  *Bennett I* Compl. ¶ 68.  Among other allegations mirroring those of the *Sant*

23   complaint, Bennett alleged Biotronik used clinical studies to pay kickbacks to physicians.  In

24   particular, he alleged Biotronik drove sales of CRM devices by paying physicians to conduct

25   clinical studies of dubious scientific validity.  *See id.* ¶¶ 96–97.

26   /////

27
_____

28            [2] His complaint refers to the "TRUST," "CELESTIAL," "CLEAR," and "GALAXY"
      studies.  *Id.* ¶ 39.

The United States moved *ex parte* to transfer the case to this district because the allegations in *Bennett I* overlapped significantly with those in the *Sant* complaint.  Mot. Transfer, *Bennett I*, ECF No. 4.  The Nevada District Court granted the motion and the case was transferred to this district and related to the *Sant* case.  *See* Order on Transfer, *Bennett I*, ECF No. 5; Related Case Order, *Bennett I*, ECF No. 18.  The United States did not intervene in *Bennett I*, and on April 30, 2014, the case was dismissed without prejudice on Bennett's request.  *See* Not. Voluntary Dismissal, *Bennett I*, ECF No. 59; U.S. Consent, *Bennett I*, ECF No. 60; Order, *Bennett I*, ECF No. 62.

      C.    <u>Bennett's Complaint in This Case</u>

On October 14, 2014, Bennett filed the *qui tam* FCA complaint in this case.  ECF No. 1.  He brings this action on behalf of the United States, twenty-eight states, and the District of Columbia.  Compl. ¶ 1.  He makes the following allegations, which at this stage the court accepts as true.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Bennett worked at Biotronik between 2004 and 2010.  Compl. ¶ 6.  During his employment, he held several positions.  *Id.*  He began as a product manager, where he worked until January 2006, until he became a Business Development Manager/Specialist, which position he held until May 2008.  *Id.*  His responsibilities included Biotronik's clinical studies and its marketing efforts in the Western United States.  *Id.*  Bennett then became a District Sales Manager for the Las Vegas, Nevada market between May 2008 and June 2010.  *Id.*  He was also Regional Sales Director for the Western Region, between January and April 2010, when his employment was terminated.  *Id.*

His complaint focuses on the sham studies mentioned in both *Sant v. Biotronik* and *Bennett I*.  It fleshes out the strategy behind those studies:  Biotronik's pacemakers and ICDs are prescribed by physicians and purchased by hospitals.  *Id.* ¶ 49.  Because doctors instruct the hospital or patient which device to purchase, Biotronik's targets were doctors.  *Id.*  To begin, Biotronik would find a doctor who had previously recommended its medical devices or who was expected to recommend those devices in the future.  *Id.* ¶ 55.  Bennett refers to these doctors as "favored physicians."  *Id.*  Biotronik then concocted a scientific study about its CRM products

1    and worked hard to contrive facially legitimate scientific justifications for conducting such a

2    study.  But at bottom these studies had no scientific or medical value.  *Id.* ¶ 60.  Biotronik then

3    promised to pay favored physicians hundreds or thousands of dollars to enroll their patients in the

4    study and to ensure the patients attended follow-up visits.  *Id.* ¶ 56.  By this strategy, Biotronik

5    encouraged physicians to enroll more patients, and Biotronik sold more devices.  *Id.* ¶ 57.  As a

6    result, for example, Biotronik's sales increased over 50 percent in the year 2009 alone, and ICD

7    sales more than tripled between 2004 and 2009.  *Id.* ¶ 85.  The complaint names and provides

8    details about sixteen specific studies, including "TRUST," "CELESTIAL," "CLEAR," and

9    "GALAXY."  *See id.* ¶¶ 82–141.

10           In the decade preceding Bennett's filing of this complaint, Biotronik paid doctors

11   tens of millions of dollars in implementing this strategy.  *Id.* ¶ 82.  The high prices of pacemakers

12   and ICDs, however, which sell for thousands of dollars each, more than offset the kickback

13   payments.  *Id.* ¶ 84.  Biotronik netted approximately $140 million in sales by paying around $42

14   million to doctors in the kickback scheme.  *Id.*

15           A few months after Bennett's complaint in this case was filed, the government

16   declined to intervene, and the case was unsealed.  *See* Order, ECF No. 12.  California also

17   declined to intervene and consented to dismissal of all state claims on behalf of all of the plaintiff

18   state governments.  ECF No. 25.  Biotronik filed this motion to dismiss in October 2015.  *See*

19   Mot. Dismiss, ECF No. 42; Mem. P. & A. (Mem.), ECF No. 43.  It advances several arguments:

20   (1) Bennett's claims are barred by *Sant v. Biotrinik* and *Bennett I* as a matter of claim preclusion;

21   (2) his claims in this case are duplicative of his claims in *Bennett I* and should be dismissed as an

22   abuse of the judicial process; (3) his claims are barred by a restriction the FCA imposes on *qui*

23   *tam* actions, the so-called "government action" rule; (4) another FCA exclusion, the "original

24   source" rule, also bars his complaint; (5) he does not plead fraud with specificity, as required by

25   Federal Rule of Civil Procedure 9(b); and (6) many of his allegations are barred by the applicable

26   statutes of limitations.  Bennett opposed the motion, ECF No. 46, and Biotronik replied, ECF

27   No. 48.

28   /////

6

1    The matter was initially submitted without argument under Federal Rule of Civil

2    Procedure 78(b) and Local Rule 230(g).  The court then reset oral argument and requested the

3    parties appear and address the application of 31 U.S.C. § 3730(e)(3) to this case and the court's

4    jurisdiction.  *See* Minute Order, ECF No. 53.  Before the hearing, Biotronik filed a notice of

5    supplemental authority on another provision, 31 U.S.C. § 3730(e)(4), attaching an unsolicited

6    supplemental brief interpreting that authority.  *See* Notice, ECF No. 54 (citing *U.S.* ex rel. *Bogina*

7    *v. Medline Industries, Inc.*, 800 F. 3d 365 (7th Cir. 2016), *affirming* No. 11-5373, 2015 WL

8    1396190 (N.D. Ill. Mar. 24, 2015)).  Bennett objected to the supplemental brief.  ECF No. 55.  At

9    hearing, the court struck all but the first paragraph of Biotronik's supplemental brief by bench

10   order, an order the court confirms here: all but the first eight lines of page one identifying

11   supplemental authority are stricken.  "No supplemental briefs shall be filed without prior leave of

12   court."  Standing Order 4, ECF No. 14-1.

13   III.    LEGAL STANDARD

14           A.    Rule 12(b)(6)

15           A party may move to dismiss for "failure to state a claim upon which relief can be

16   granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the complaint lacks a

17   "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

18   *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013).  The court

19   assumes these factual allegations are true and draws reasonable inferences from them.  *Iqbal*,

20   556 U.S. at 678.

21           A complaint need contain only a "short and plain statement of the claim showing

22   that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations,"

23   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than

24   unadorned accusations; "sufficient factual matter" must make the claim at least plausible.  *Iqbal*,

25   556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of a claim's elements do

26   not alone suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Evaluation under Rule 12(b)(6) is a

27   context-specific task drawing on "judicial experience and common sense."  *Id.* at 679.  And aside

28   from the complaint, district courts have discretion to examine documents incorporated by

7

1  reference, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1159–60 (9th Cir. 2012);

2  affirmative defenses based on the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175,

3  1179 (9th Cir. 2013); and proper subjects of judicial notice, *W. Radio*, 678 F.3d at 976.

4          B.    <u>Rule 9</u>

5          Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on

6  fraud allegations, including claims under the FCA.  *See, e.g.*, *Ebeid* ex rel. *U.S. v. Lungwitz*,

7  616 F.3d 993, 998 (9th Cir. 2010).  Rule 9(b) provides, "In alleging fraud or mistake, a party must

8  state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

9  knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

10  9(b).  This rule requires a fraud plaintiff state the particular circumstances of a fraud, including

11  the "who, what, when, where, and how of the misconduct charged."  *Ebeid*, 616 F.3d at 998

12  (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

13  IV.    <u>DISCUSSION</u>

14          A.    <u>Federal Claim Under the FCA</u>

15          The FCA prohibits the submission of false or fraudulent claims for payment by the

16  United States government.  *See* 31 U.S.C. § 3729; *Kellogg Brown & Root Servs., Inc. v. U.S.*,

17  ex rel. *Carter*, ___ U.S. ___, 135 S. Ct. 1970, 1973 (2015).  It is the government's primary means

18  for litigating claims fraud.  *U.S.* ex rel. *Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993).  The

19  FCA is enforced both by the government and by civil *qui tam* lawsuits filed by private litigants,

20  or relators.  *See* 31 U.S.C. § 3730(b); *Kellogg*, 135 S. Ct. at 1973.

21          Several statutory restrictions apply to *qui tam* FCA actions.  One of these rules

22  bars private actions based on a foundation that the government has already begun litigating: "In

23  no event may a person bring an action under [the FCA] which is based upon allegations or

24  transactions which are the subject of a civil suit or an administrative civil money penalty

25  proceeding in which the Government is already a party."  31 U.S.C. § 3730(e)(3).  The court

26  concludes this restriction bars Bennett's federal claim, as discussed below.

27  /////

28  /////

1            1.     *Qui Tam* FCA Claims and § 3730(e)(3) in General

2            In a frequently cited opinion, the First Circuit explained the history and intent of

3     § 3730(e)(3).  *See United States* ex rel. *S. Prawer and & Co. v. Fleet Bank of Maine*, 24 F.3d 320,

4     324–26 (1st Cir. 1994), *overruled on other grounds*, *Allison Engine Co. v. U.S.* ex rel. *Sanders*,

5     553 U.S. 662 (2008).[3]  In the wake of the New Deal and World War II, government contracts to

6     private parties surged.  *Id.* at 324.  As may be expected, the number of *qui tam* FCA actions

7     surged as well.  *Id.*  Many of these actions were attempts at rent-seeking by copycat relators who

8     drew from other cases or sources to report frauds the government had already discovered.  *Id.* at

9     324–25.  Congress responded to such "parasitic" *qui tam* cases by amending the FCA in 1943 to

10    prohibit all *qui tam* actions "based on evidence or information the Government had when the

11    action was brought."  *Id.* at 325 (quoting 31 U.S.C. § 3730(b)(4) (1982), *superseded by* False

12    Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153 (1986))).

13           After the 1943 amendments took effect, federal courts construed their jurisdiction

14    narrowly and strictly.  *Id.* at 325–26 (citing *U.S.*, ex rel. *State of Wis. v. Dean*, 729 F.2d 1100 (7th

15    Cir. 1984)).  These decision led Congress to perceive a need to revise the FCA to "enhance the

16    Government's ability to recover losses sustained as a result of fraud . . . ."  *Id.* at 326 (quoting

17    *Quinn*, 14 F.3d at 650).  Section 3730(e)(3) was a product of this second round of amendments.

18    *See id.*  Congress attempted to "walk a fine line between encouraging whistle-blowing and

19    discouraging opportunistic behavior."  *Id.* (quoting *Quinn*, 14 F.3d at 651).

20           After reviewing this history, the *Prawer* court held the purpose of § 3730(e)(3)

21    was to prevent the prosecution of *qui tam* FCA claims that stood to enrich the relator but not to

22    expose fraud.  *Id.* at 327–28.  The First Circuit drew heavily on an analogy to a parasite, which

23    receives support and advantage from a host without giving that host anything in return.  *Id.*  With

24    these rules in mind, the *Prawer* court decided the case before it could proceed for two reasons:

25    (1) the relator sought "to remedy fraud that the government has not yet attempted to remedy"; and

---

26
27         [3] The Court of Appeals for the District of Columbia summarized much of the same history in *United States* ex rel. *Springfield Terminal Railway Company v. Quinn*, 14 F.3d 645, 649–51 (D.C. Cir. 1994), and the *Prawer* court in turn drew heavily on that opinion, *see Prawer*, 24 F.3d

28    at 324–26.

1    (2) the government could not have recovered against the defendant in the precursor or supposed

2    "host" case. *Id.* at 328–29.  In short, the *qui tam* suit had value to the government

3              Many federal courts have followed the First Circuit's lead and have held that

4    § 3730(e)(3) "was intended to prevent parasitic *qui tam* lawsuits that receive support from an

5    earlier case without giving the government any useful return, other than the potential for

6    additional monetary recovery."  *United States ex rel. Batty v. Amerigroup Illinois, Inc.*,

7    528 F. Supp. 2d 861, 876 (N.D. Ill. 2007); *see also Costner v. URS Consultants, Inc.*, 153 F.3d

8    667, 675–76 (8th Cir. 1998); *U.S.* ex rel. *Int'l Bhd. of Elec. Workers, Local Union No. 98 v.*

9    *Farfield Co.*, No. 09-4230, 2013 WL 3327505, at *11 (E.D. Pa. July 2, 2013); *U.S.* ex rel. *Loi*

10   *Trinh v. Ne. Med. Servs., Inc.*, No. 10-1904, 2013 WL 1789712, at *4–5 (N.D. Cal. Apr. 26,

11   2013); *U.S.* ex rel. *Dugan v. ADT Sec. Servs., Inc.*, No. 03-3485, 2009 WL 3232080, at *12 (D.

12   Md. Sept. 29, 2009); *U.S.* ex rel. *Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 302–03 (D.D.C.

13   1996); *but see, e.g.*, *Taul* ex rel. *U.S. v. Nagel Enters., Inc.*, No. 14-0061, 2016 WL 304581, at *4

14   (N.D. Ala. Jan. 25, 2016) (finding *Prawer* was "not much help" in deciding anything beyond

15   whether allegations in the current case had already been raised).

16              2.      Section 3730(e)(3) Applied to Bennett's Claims

17              Here, there is no question the complaint in *Sant v. Biotronik* raised the same

18   allegations as Bennett does in this case.  As did the relator in *Sant v. Biotronik*, Bennett alleges

19   Biotronik paid doctors kickbacks to prescribe its CRM devices and attempted to shroud these

20   payments with the legitimacy of contrived scientific studies.  Bennett does not suggest otherwise

21   in his opposition.  *See* Opp'n at 8–9.  His only arguments against application of § 3730(e)(3) to

22   his case are (1) the *Sant v. Biotronik* case was dismissed without prejudice to allow the

23   government to pursue claims related to sham clinical studies; and (2) *Sant v. Biotronik* is no

24   longer pending.  *See id.*  In light of the backdrop described above, neither of these arguments is

25   persuasive.

26              a)      Intervention in Part

27              As to Bennett's first argument, § 3730(e)(3) by its terms bars "an action . . . based

28   upon allegations or transactions which are the subject of a civil suit . . . in which the Government

1   is already a party."  It draws no distinctions between "allegations or transactions" in the

2   government's earlier involvement.  It refers not to claims, causes of actions, theories, or

3   violations, but to "civil suit[s]" and "administrative civil money penalty proceeding[s]."

4   Bennett's argument would divide *Sant v. Biotronik* into two "suits" or "proceedings" artificially:

5   the action in which the United States intervened and the action in which it did not intervene.

6   Under a more natural understanding of that case, the United States became aware of a wide-

7   reaching alleged fraud, which included allegations related to sham studies, it investigated all of

8   those claims, and after its investigation, negotiated a joint settlement of the case and complaint.

9   This understanding also fits the purpose of § 3730(e)(3), to dispense with *qui tam* claims of

10  wrongdoing the government has already discovered thanks to previous suits or proceedings.  *See,*

11  *e.g.*, *Prawer*, 24 F.3d at 329 ("[W]e think it would be useful for the court to . . . ask whether the

12  *qui tam* case is receiving support, advantage, or the like from the host case (in which the

13  government is a party) without giving any useful or proper return to the government (or at least

14  having the potential to do so)." (citation and quotation marks omitted)); *Quinn*, 14 F.3d at 651

15  ("[The FCA's *qui tam* provisions] must be analyzed in the context of these twin goals of rejecting

16  suits which the government is capable of pursuing itself, while promoting those which the

17  government is not equipped to bring on its own.").

18          At hearing both parties also relied on the Supreme Court's decision in *U.S.* ex rel.

19  *Eisenstein v. City of N.Y.*, 556 U.S. 928 (2009).  In that case, the Court implicitly understood that

20  intervention made the United States a party to the "lawsuit," the "action," the "case," or the

21  "litigation," *id.* at 932–33, and not merely to an allegation or charge.  The relevant FCA

22  provisions also refer to the "action" and not theories or allegations.  *See* 31 U.S.C. § 3730(b)(2)

23  ("The Government may elect to intervene and proceed with the action . . . ."); *id.* § 3730(b)(4)

24  ("Before the expiration of the 60-day period or any extensions . . . the Government shall . . .

25  proceed with the action, in which case the action shall be conducted by the Government. . . .").

26          Some authority allows the United States to seek "partial intervention" in FCA

27  cases.  *See, e.g.*, *U.S.* ex rel. *Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d

28  613, 616–17 (S.D.N.Y. 2006).  These decisions, however, do not consider the impact of

11

1    § 3730(e)(3), the context of that subsection, or the points discussed above, so they do not support

2    Bennett's position here.

3            The court finds the United States was a party to *Sant v. Biotronik*, including *Sant's*

4    claims about sham studies, for purposes of § 3730(e)(3).

5                            b)          The Status of the Previous Suit

6            Bennett's second argument notes § 3730(e)(3) uses of the present tense:

7    "allegations or transactions which are the subject of a civil suit . . . in which the Government is

8    already a party."  Therefore, he contends, because *Sant v. Biotronik* has concluded, his complaint

9    may proceed.  The parties have not cited and the court is unaware of any binding authority on

10   point.  But considering the authorities discussed above, the court concludes § 3730(e)(3) cannot

11   be interpreted as Bennett suggests.

12           For one, Congress did not use the word "pending" in § 3730(e)(3).  It could

13   reasonably have done so should it have intended that subparagraph to lose effect once the earlier

14   action is dismissed.  In other words, Congress did not prohibit "an action based upon allegations

15   or transactions which are the subject of a *pending* civil suit or an administrative civil money

16   penalty proceeding in which the Government is already a party."  In this respect § 3730(e)(3)

17   contrasts with § 3730(b)(5), which does use the word "pending."  *See* 31 U.S.C. § 3730(b)(5)

18   ("When a person brings an action under this subsection, no person other than the Government

19   may intervene or bring a related action based on the facts underlying the pending action.").  In a

20   recent panel opinion from the D.C. Circuit, a dissenting judge recognized this distinction and

21   suggested § 3730(b)(5) would apply only to pending suits, but § 3730(e)(3) would not; the

22   Supreme Court later vindicated this dissenter and vacated the circuit court's opinion in light of

23   *Kellogg*, 135 S. Ct. 1970, which concerned the word "pending."  *See U.S., ex rel. Shea v. Cellco

24   P'ship*, 748 F.3d 338, 348 (D.C. Cir. 2014) (Srinivasan, J., concurring in part and dissenting in

25   part), *cert. granted, judgment vacated*, 135 S. Ct. 2376 (2015).

26           This distinction between § 3730(b)(5) and § 3730(e)(3) is also sensible from a

27   practical point of view.  As the Supreme Court noted in *Kellogg*, Congress could not have

28   intended to bar a second-filed suit under § 3730(b)(5) if the first suit was dismissed for a reason

1    unrelated to its merits. *See* 135 S. Ct. at 1979. This danger is absent when, as here, the

2    government participated in the earlier suit, as § 3730(e)(3) requires and § 3730(b)(5) does not.

3         In addition, Bennett's interpretation would clash with the widely recognized

4    purpose of § 3730(e)(3): discouraging follow-on lawsuits that provide the government with little

5    or no benefit. In the words of a Pennsylvania District Court, "the purpose of Section 3730(e)(3)

6    is to prohibit 'piggybacking' by private parties where an investigation was conducted and

7    disclosed either by the government or other public sources." *Int'l Bhd. of Elec. Workers*, 2013

8    WL 3327505, at *13; *see also Dugan*, 2009 WL 3232080, at *12 ("The FCA encourages relators

9    who have independently discovered information of fraud to come forward, while discouraging

10    those plaintiffs who merely feed off previous disclosures of government fraud."). Here, the

11    government had already learned through Sant's complaint that Biotronik had allegedly used

12    medical studies to mask a kickback scheme and had an opportunity to investigate and prosecute

13    fraud on this basis, but did not. The government's knowledge of these claims did not disappear

14    upon the closure of *Sant v. Biotronik*. Similarly, in this case, unlike in the case before the *Prawer*

15    court, Bennett seeks to remedy fraud the government has already been alerted to, and nothing

16    suggests the government was unable to recover for the alleged sham studies in *Sant v. Biotronik*.

17    *Cf. Prawer*, 24 F.3d at 328–29.

18         Other federal courts have described the effect of § 3730(e)(3) in terms that

19    undermine Bennett's position, drawing no distinctions between closed and pending cases. For

20    example, the Ninth Circuit read § 3730(e)(3) without a limitation to pending cases in *United*

21    *States* ex rel. *Kelly v. Boeing Co.*, 9 F.3d at 746 ("If the government files an action to enforce the

22    FCA, a would-be relator may not later bring any action based on the same underlying facts."). In

23    *Costner v. URS Consultants, Inc.*, the Eighth Circuit allowed a subsequent case to proceed despite

24    § 3730(e)(3) because the allegations in question "ha[d] never before been the subject of a FCA

25    suit or any other suit or proceeding brought by the government or anyone else." 153 F.3d at 676.

26    In the Fifth Circuit, a concurring judge read § 3730(e)(3) the same way in *U.S.* ex rel. *Babalola v.*

27    *Sharma*, 746 F.3d 157, 165 (5th Cir.) (Dennis, J., concurring), *cert. denied sub nom. U.S. ex rel.*

28    *Babalola v. United States*, 134 S. Ct. 2856 (2014) ("Under § 3730(e)(3), if whistleblowers

1   provide the government with evidence of fraud but do not first file a *qui tam* suit, and the

2   government then uses the whistleblowers' information to file the government's own False Claims

3   Act suit . . . the whistleblowers receive nothing under the False Claims Act."). And in *Prawer*,

4   the First Circuit was untroubled by the intervening conclusion of the underlying case. *See* 24

5   F.3d at 323. District courts have generally applied the same reading. *See, e.g.*, *Taul,* 2016 WL

6   304581, at *4 (§ 3730(e)(3) is concerned with "whether the allegations and transactions . . . are

7   already being or have been litigated"); *U.S.* ex rel. *Roby v. Boeing Co.*, 73 F. Supp. 2d 897, 905

8   (S.D. Ohio 1999) ("If the government files an action to enforce the FCA, a would-be relator may

9   not later bring an action based on the same underlying facts."); *but see Loi Trinh*, 2013 WL

10  1789712, at *4 ("To prevent private citizens from abusing this incentive system, the statute bars

11  relators from filing copycat lawsuits against a suspected FCA violator who is already the

12  defendant in a *pending* FCA action by the government." (emphasis added)).

13          The FCA claim is therefore dismissed with prejudice and without leave to amend.

14  Because the federal claim is dismissed on this ground, the court does not reach Biotronik's other

15  alternative arguments.

16          B.      State Claims

17          The current complaint invokes this court's jurisdiction under 28 U.S.C. § 1331,

18  which grants the court subject matter jurisdiction over claims arising under the laws of the United

19  States, and § 1367, which grants the court supplemental jurisdiction over claims so related to

20  federal claims that they form part of the same case or controversy. *See* Compl. ¶¶ 8–9.

21          Under § 1367, a federal district court has discretion to exercise supplemental

22  jurisdiction over state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40

23  (2009). Section 1367(c) lists four conditions that "trigger" a district court's discretion to dismiss

24  a state-law claim: "(1) the claim raises a novel or complex issue of State law, (2) the claim

25  substantially predominates over the claim or claims over which the district court has original

26  jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction,

27  or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

28  The court's decision is also informed by "values of economy, convenience, fairness, and comity."

14

1    *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citations and

2    quotation marks omitted).

3                   In the ordinary case, when a plaintiff's federal-law claims are dismissed before

4    trial, the balance of these factors weighs against retaining jurisdiction over the state law claims.

5    *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  But this rule is neither

6    mandatory nor inflexible; the court must take its discretionary responsibility seriously and reach a

7    deliberate decision.  *See id.*; *Acri*, 114 F.3d at 1001.

8                   In the absence of any other basis for jurisdiction, at this relatively early stage,

9    dismissal is appropriate under the factors of 28 U.S.C. § 1367(c); *Acri*, 114 F.3d at 1001.  The

10   court acknowledges the practical difficulties associated with maintaining a multi-state false-

11   claims action like this one anywhere but federal district court; however, practical difficulties

12   would challenge the litigation of this case in federal court as well.  Without a federal claim as an

13   anchor, tethering the false-claims laws of twenty-nine jurisdictions to one action is not sufficient

14   to proceed in federal court.

15                  Bennett argues his complaint could be amended to invoke this court's subject

16   matter jurisdiction under 28 U.S.C. § 1332, diversity jurisdiction.  But for purposes of

17   determining citizenship under that section, the court looks not to Bennett's citizenship, but the

18   citizenship of the real party in interest.  *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980).  In

19   what remains of this action, brought on behalf of a number of states to recover the amounts they

20   allegedly paid under false pretenses, those states are the real parties in interest.  *See U.S. ex rel.*

21   *Eisenstein*, 556 U.S. at 934–35 ("The phrase, 'real party in interest,' is a term of art utilized in

22   federal law to refer to an actor with a substantive right whose interests may be represented in

23   litigation by another."); *N.M. ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Capital Mgmt. Ltd.*,

24   671 F. Supp. 2d 1248, 1251 (D.N.M. 2009) ("[A] state is a real party in interest in cases where the

25   state may or may not be a named party, but has some type of financial or regulatory interest in the

26   lawsuit, even though the action is actually being prosecuted by a different person or entity.");

27   *cf. Eisenstein*, 556 U.S. at 930 ("[T]he United States is a 'real party in interest' in a case brought

28   under the FCA.").  Because "a State is not a 'citizen' for purposes of the diversity jurisdiction,"

1  *Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973), this case could not be maintained on the basis

2  of § 1332.  *See, e.g.*, *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*,

3  535 F.3d 300, 303 (4th Cir. 2008); *Nat'l Educ. Ass'n of N.M.*, 671 F. Supp. 2d at 1250; *see also*

4  14B Charles A. Wright et al., Federal Practice & Procedure § 3723 (4th ed. 2009) ("[W]hen a

5  state is a real party in interest, the case cannot be removed on the basis of diversity of citizenship

6  jurisdiction.").

7  V.    <u>CONCLUSION</u>

8       Biotronik's supplemental brief, ECF No. 54, is STRICKEN IN PART as described

9  above.  The motion to dismiss is GRANTED with prejudice and without leave to amend as to the

10  federal claims under the False Claims Act.  The motion is also GRANTED as to the remaining

11  claims, but without prejudice to refiling in state court.  This order resolves ECF No. 42.

12       IT IS SO ORDERED.

13  DATED:  April 19, 2016.

14

15                                     UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28